**FEDERAL DEPOSIT INSURANCE CORPORATION, as Liquidator for the Hamilton National Bank of Chattanooga, Plaintiff-Appellee,**

v.

**LATTIMORE LAND CORPORATION, et al., Defendants-Appellants.**

No. 80–7635.

United States Court of Appeals,
Fifth Circuit.
Unit B

Sept. 14, 1981.

Ronald E. Ginsberg, Erwin A. Friedman, Savannah, Ga., for defendants-appellants.

Leamon R. Holliday, Savannah, Ga., Frank L. Skillern, Jr., Gen. Counsel, Fed. Deposit Ins. Corp., Albert J. Tumpson, Myers N. Fisher, Asst. Gen. Counsel, Washington, D. C., for plaintiff-appellee.

Before TUTTLE, HILL and THOMAS A. CLARK, Circuit Judges.

TUTTLE, Circuit Judge:

Collecting on the notes it holds appears to be an occasionally difficult task for the Federal Deposit Insurance Corporation (FDIC). In this action on a note, the FDIC is faced with familiar claims and defenses by obligors who have long been delinquent in their payments on the note. The district court disallowed most of those claims and defenses and granted the FDIC's motion for summary judgment on the liability on the note. The resulting appeal by the obligors draws our affirmance of the district court.

## FACTS

On May 24, 1974, Lattimore Land Corporation made a real estate note for $1,450,-000 payable to Hamilton Mortgage Corporation. William Lattimore and J. Robert Ratchford, respectively president and secretary of Lattimore Land, signed the note for the Corporation. These two individuals, joined by Helen C. Lattimore and Barbara H. Ratchford also signed the note under the Guaranty of Payment section. The note provided for principal payments of $217,500 and $435,000 respectively on the first and second anniversaries of the note's making. The outstanding principal plus accrued interest was due on April 24, 1977.

Lattimore Land entered this initial loan agreement apparently desirous of securing future loans from Hamilton Mortgage. Subsequent loans allegedly would have funded the outstanding indebtedness and additional advances would have provided capital needed to develop the real estate

that secured the initial note. These purported expectations were not met. Although the appellants claim that Hamilton Mortgage represented that it could and would provide the necessary development financing, Hamilton Mortgage, less than ninety days after the making of the note, according to appellants, informed William Lattimore that it lacked the financial resources to make the development financing that had been contemplated. The obligors allege that these broken promises and misrepresentations led to their inability to pay the sums due under the note, which remains largely unpaid to the present.

At this time, Hamilton Mortgage and the Hamilton National Bank of Chattanooga had begun encountering severe financial difficulties. On October 25, 1975, Hamilton Mortgage assigned a 91.48% interest in the note to the Hamilton National Bank. On February 16, 1976, the Comptroller of the Currency declared the Bank to be insolvent. That same day a United States District Court authorized the FDIC in its corporate capacity to purchase under 12 U.S.C. § 1823 certain of the Bank's assets. One of the assets purchased was the 91.48% interest in the present note. Hamilton Mortgage encountered similar misfortunes. On February 20, 1976, it filed a petition in bankruptcy.

This bankruptcy action led to the FDIC's acquisition of the remaining interest in the note. The trustee in bankruptcy challenged the FDIC's right to assets which had been acquired by Hamilton National Bank from Hamilton Mortgage just prior to the filing of the bankruptcy petition. This dispute was resolved by a settlement agreement which in part resulted in the FDIC's acquisition of all interest in the note and its assumption of the status of holder of the note.

Since those events, the FDIC has pursued its rights on the note. The FDIC, through its legal counsel, on March 31, 1978, demanded payment of the note from the present defendants who include Lattimore Land and the individual signers of the note. Not receiving satisfaction, the FDIC on September 15, 1978, filed a complaint in the present action. In the proceedings in the district court, the obligors raised several defenses and claims for damages. Finding the obligors' arguments unpersuasive, the district court granted the FDIC's motion for summary judgment on the issue of the defendants' liability on the note, reserving issues of usury, amounts of interest, and the extent of the married women-defendants' liability. Subsequently, the district court struck the usury defense and then granted judgment to the FDIC in amounts of $1,366,922.01 principal plus $18,978.02 additional principal, $830,348.95 interest, and $219,974.33 attorneys' fees. That judgment was limited to the extent that the FDIC could not use it to levy upon the tangible personal property of defendant-Barbara Ratchford.

From that judgment the obligors appeal, alleging three basic errors by the district court.

## ISSUES ON APPEAL

1. *Applicability of FDIC's Statutory Protection*

■ The obligors first claim that for numerous reasons the FDIC's statutory protection under 12 U.S.C. § 1823(e) does not apply. The statute provides that:

No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

12 U.S.C.A. § 1823(e) (West 1980). This statute might impair the obligors' case, because they sought to hold the FDIC, as assignee of the note, liable for Hamilton Mortgage's failure to fund the development under the terms of the alleged oral agreement, which would not meet the statutory requirements of a valid agreement assertable against the FDIC.

The obligors first contend that, with respect to the note in question, the FDIC may not assert the statutory protection because the note was not acquired from an insured bank as is required by 12 U.S.C. § 1823 [1]. This argument, which ignores the FDIC's acquisition of an asset from the receiver of an insured bank prior to the physical acquisition of the note from another source, has been specifically rejected by this Court. *Chatham Ventures, Inc. v. FDIC*, 651 F.2d 355 (5th Cir. 1981). Under that case, this Court must treat the entire interest in the note as protected under the statute.

The obligors also contend that 12 U.S.C. § 1823 does not apply where the obligors are free of any wrongdoing and are not customers of an insured bank. These arguments, as well, were fully rejected by the Court in *Chatham Ventures, Inc. v. FDIC*, 651 F.2d 355 (5th Cir. 1981), and further discussion of those arguments would not be useful.

The district court correctly concluded that 12 U.S.C. § 1823 applies in this case to make irrelevant the assertion against the corporate FDIC of any unwritten side agreements such as the agreement to make future loans [2].

### 2. Fraudulent Inducement

#### a. Scope of Claims

Even if FDIC's statutory protection is applicable to this case, there remains the question of whether it protects the FDIC against all assertions by the obligors. In addition to the contention that the unwritten agreements are valid, which we have decided is not viable against the FDIC, the present obligors assert that the entire agreement including the written note should be unenforceable because Hamilton Mortgage materially misrepresented its ability and willingness to fund the development. The obligors argue that they could have successfully proved at trial constructive fraud in the inducement of the execution of the note before us and that 12 U.S.C. § 1823(e) does not shield the FDIC from such a defense because the obligors are seeking to avoid the agreement not enforce an unwritten agreement against the FDIC.

#### b. Sovereign Immunity

■■■ Before reaching the question of whether section 1823 protects it against this claim, the FDIC raises a defense of sovereign immunity. To the extent that the fraud alleged is a tort, the FDIC argues that it may not be sued because the sovereign immunity of the United States with respect to a suit directly against a United States agency has not been waived by the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* Litigants generally may not sue the FDIC for money damages

1. Regarding a proper acquisition of an asset by the FDIC, the statute provides that:

 Whenever in the judgment of the Board of Directors such action will reduce the risk or avert a threatened loss to the Corporation and will facilitate a merger or consolidation of an insured bank with another insured bank, or will facilitate the sale of the assets of an open or closed insured bank to and assumption of its liabilities by another insured bank, the Corporation may, upon such terms and conditions as it may determine, make loans secured in whole or in part by assets of an open or closed insured bank, which loans may be in subordination to the rights of depositors and other creditors, or the Corporation may purchase any such assets or may guarantee any other insured bank against loss by reason of its assuming the liabilities and purchasing the assets of an open or closed insured bank. Any insured national bank or District bank, or the Corporation as receiver thereof, is authorized to contract for such sales or loans and to pledge any assets of the bank to secure such loans. 12 U.S.C.A. § 1823(e) (West 1980).

2. Our response to the concerns raised by Judge Clark is outlined in *Chatham Ventures, Inc. v. FDIC*, 651 F.2d at 360 n.10.

under that Act. *See Gregory v. Mitchell,* 634 F.2d 199, 203–05 (5th Cir. 1981). The law is somewhat different, however, if the FDIC first seeks to assert claims against its adversary. Courts have recognized that a federal agency[3] in bringing suit, although not subject to suit on unrelated claims, *see FDIC v. Citizens Bank & Trust Co.,* 592 F.2d 364, 368–73 (7th Cir. 1979), is exposed to claims of recoupment. *See Frederick v. United States,* 386 F.2d 481, 488 (5th Cir. 1967)[4]. Such claims must arise out of the same transaction or occurrence that is the subject of the agency's suit and may not exceed the claims made by the agency. The present litigants on appeal characterize the obligors' claim as concerning their right to "set off" their claims against those of the FDIC. Despite the label attached by the

parties, this Court believes that a more felicitous characterization of the claims would be "recoupment," as defined by the *Frederick* Court, because the claims arise out of the same transaction that engendered the FDIC's claims—the FDIC sued on a note and the obligors deny the validity of the note based on their fraud claims[5]. Sovereign immunity, therefore, does not bar the obligors' challenges to the validity of the note.

### c. Georgia Law of Fraudulent Inducement

█ This Court, however, rejects the obligors' fraudulent inducement argument because, as was found by the district court, the obligors' case is not sufficient under state law[6].

**3.** The FDIC falls within this characterization, without question, for present purposes. *See Safeway Portland Employee's Federal Credit Union v. FDIC,* 506 F.2d 1213, 1215 (9th Cir. 1970).

**4.** The *Frederick* Court stated the test:

Our conclusion is that when the sovereign sues it waives immunity as to claims of the defendant which assert matters in recoupment—arising out of the same transaction or occurrence which is the subject matter of the government's suit, and to the extent of defeating the government's claim but not to the extent of a judgment against the government which is affirmative in the sense of involving relief different in kind or nature to that sought by the government or in the sense of exceeding the amount of the government's claims; but the sovereign does not waive immunity as to claims which do not meet the "same transaction or occurrence test" nor to claims exceeding in amount that sought it as plaintiff. . . . This ties in with the distinction made in Rule 13 itself. As defined in 13(c), a counterclaim may diminish or defeat the recovery sought by the opposite party—this far the government's waiver goes. It may also, but need not, "claim relief exceeding in amount or different in kind from that sought in the pleading of the opposing party." The government does not go so far as to waive its immunity to this kind of claim.

*Id.* (citations and footnotes omitted.)

**5.** *Cf. Riverside Park Realty Co. v. FDIC,* 465 F.Supp. 305, 314 (M.D.Tenn.1978). *See also* R. Field, B. Kaplan & K. Clermont, *Civil Procedure* 427–29 (4th ed. 1978). While recoupment reduces the plaintiff's recovery based on events within the same transaction from which springs the plaintiff's claim, setoff would be a

proper characterization where the defendants' response arises from an independent transaction which results in liability running against the plaintiff. Such a case of setoff might occur if each party holds a note of the other. *Id.*

**6.** Neither side questions that, if the law of any state applies, the law of the state of Georgia is the proper body of law for reference with respect to the fraud claim in the present action. The reference to state law is not compelled by *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). This action involves the rights of the FDIC, a federal agency. Federal law governs the determination of the rights of the FDIC. *See FDIC v. Meo,* 505 F.2d 790, 793 n.4 (9th Cir. 1974); *Riverside Park Realty Co. v. FDIC,* 465 F.Supp. 305, 308 (M.D.Tenn. 1978); *FDIC v. Rectenwall,* 97 F.Supp. 273, 274 (N.D.Ind.1951); 12 U.S.C.A. § 1819 (Fourth). As Justice Jackson stated:

This case is not entertained by the federal courts because of diversity of citizenship. It is here because a federal agency brings the action, and the law of its being provides, with exceptions not important here, that: "All suits of a civil nature at common law or in equity to which the Corporation shall be a party shall be deemed to arise under the laws of the United States: . . ." That this provision is not merely jurisdictional is suggested by the presence in the same section of the Act of the separate provision that the Corporation may sue and be sued "in any court of law or equity, State or Federal."

. . . . .

A federal court sitting in a non-diversity case such as this does not sit as a local tribunal. In some cases it may see fit for special reasons to give the law of a particular

The obligors characterize the alleged fraud in the case as a misrepresentation of the "facts" of Hamilton Mortgage's solvency and financial capabilities [7]. The obligors also allege that Hamilton Mortgage failed to make further loans to complete the development of the real estate. A review of the presentation by the obligors to the district court demonstrates that, as the district court concluded, the obligors' case amounts to a breach of an alleged promise to extend future credit [8].

Whether or not the obligors' assertions are true [9], this case is insufficient on this basis. An agreement to make a loan is unenforceable under Georgia law where the parties have not yet agreed to a rate of interest or maturity date. *See Gay v. Grace*, 433 F.2d 14, 15 (5th Cir. 1970); *Scott v. Lewis*, 112 Ga.App. 195, 144 S.E.2d 460 (1965); *Stanaland v. Stephens*, 78 Ga.App. 68, 50 S.E.2d 258 (1948). A breach of such a promise will not support a fraud action under Georgia law.

There is no merit in Bonner's contention that he was unlawfully misled by Wachovia's promises to make the development loan, *even if Wachovia had no intention of making such advances*. The general rule is that fraud cannot be predicated upon statements which are promissory in their nature as to future acts.

state highly persuasive or even controlling effect, but in the last analysis its decision turns upon the law of the United States, not that of any state.

*D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 467–68, 471, 62 S.Ct. 676, 683–684, 685, 86 L.Ed. 956 (1942) (concurring opinion). In light of our disposition of the case, there is, however, no need to decide whether we would adopt state law or fashion a uniform federal standard where the state law indicates a result less favorable to the FDIC than the result obtained here. *See United States v. Kimbell Foods*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). *See also* note 13 *infra.*

7. An action for fraud based on opinion is not sufficient in Georgia. *Wrenn & Sons v. Truitt*, 116 Ga. 708, 43 S.E. 52 (1902); *DeMayo v. Walton*, 114 Ga.App. 483, 151 S.E.2d 886 (1966). But the difference between fact and opinion has been called a "subtle and elusive distinction." *United States v. Northeast Constr. Co.*, 298 F.Supp. 1135, 1139 (S.D.Ga. 1969). *See also S & S Builders, Inc. v. Equitable Investment Corp.*, 219 Ga. 557, 134 S.E.2d 777 (1964).

The statements by Hamilton Mortgage that were actually reduced to writing appear to us to be representative of: (1) facts that were true when made; or (2) opinions or predictions of future events which would not suffice as bases for a Georgia fraud claim. *See* notes 8, 9 & 10, *infra.*

8. This observation is most clearly illustrated by the obligors' argument to the district court in opposition to the FDIC's motion for summary judgment:

3. Defendants claim that in its negotiation of the loan agreement with HMC, HMC represented that it was financially able to provide LLC with a full line of loans including the development loan which all parties understood was necessary at that time to liquidate the acquisition loan. Defendant LLC claims that this material misrepresentation induced LLC to execute the Note and to convey to HMC the Deed to Secure Debt on the 270 acres. The individual Defendants claim that this was a material representation made to induce them to endorse the loan as accommodation parties and entitles them to a rescission of their contractual guarantee.

4. Defendants further claim that in its loan agreement with LLC, HMC was required to be able to provide loans to LLC upon terms competitive with other local lenders. Defendant LLC claims that HMC breached this covenant and that it is entitled to recoup or setoff damages LLC sustained as a result of this breach of the agreement. Plaintiffs in their Motion for Summary Judgment claim that the terms concerning these future development loans is [sic] so vague and indefinite to be unenforceable. However, Defendants are prepared to provide testimony of local bankers and mortgage company officers to establish the terms that would have been required to be competitive with local lenders in making development loans.

The question of solvency as discussed by the obligors is only relevant as it related to the possibility of the extension of future credit by Hamilton Mortgage.

9. The obligors point to language in the amended commitment letter of April 10, 1974 in which Hamilton Mortgage stated that: "HMC is an active lender desirous of this type of financing and will at all times be competitive with other lenders." In addition, the obligors quote a Hamilton Mortgage economic summary of the project which states that: "This loan will be repaid by the funding of development loans to be made by us." The obligors claim that with this language and oral representations, Hamilton Mortgage became obligated to make future loans.

Furthermore, no evidence was offered concerning the amount of a development loan, how or when the property was to be developed, the rate of interest or its term. If the parties to a transaction do not create binding agreements, the courts are powerless to do it for them, or to afford a remedy for a breach, . . . [W]e conclude that a promise, *even a false promise*, to perform an act in the future is not a false pretense or false representation, and does not constitute the basis for an action for fraud. . . . We hold that failure to fund money or lend to a principal additional sums, does not operate to discharge guarantors from liability for the amount which was actually advanced by the lender.

*Bonner v. Wachovia Mortgage Co.*, 142 Ga. App. 748, 750, 236 S.E.2d 877 (1977) (emphasis added and citations omitted). The Georgia cases holding for this proposition are legion. *See, e. g., Clare Development Corp. v. First National Bank*, 243 Ga. 709, 709, 256 S.E.2d 452 (1979); *Hornsby v. First National Bank*, 154 Ga.App. 155, 157–58, 267 S.E.2d 780 (1980); *Rizk v. Jones*, 148 Ga. App. 473, 474–75, 251 S.E.2d 360 (1978), *aff'd*, 243 Ga. 545, 255 S.E.2d 19 (1979); *Colodny v. Dominion Mortgage & Realty Trust*, 141 Ga.App. 139, 141–42, 232 S.E.2d 601 (1977); *Beasley v. Ponder*, 143 Ga.App.

810, 810, 240 S.E.2d 111 (1977). *See also Keiley v. Cleage*, 150 Ga. 215, 215–16, 103 S.E. 167 (1920). These cases rest upon several bases. First, an obligor should repay funds he actually received. Second, a court should not make a contract for the parties when, as in this case, they have not specified such vital terms of the future loans as interest rate, principal amount, or maturity period. Third, a promise to do a future act is not normally a representation of fact.[10] Under this state of the Georgia law, the obligors may not assert a breach of a promise to extend future credit. The obligors make a clever argument, but Georgia law will not allow the obligors to prove their case by a second alleged and unremediable breach under Georgia law. We do not believe that a circumvention of the Georgia cases discussed above is proper. If an obligor may not rely upon a specific promise to extend future credit as a basis for a fraudulent inducement action, then he should not be able to make out such a claim based on the misrepresentation of a lender's financial condition as it relates to the lender's ability to extend future credit. Solvent or not, Hamilton Mortgage had no obligation to make subsequent loans to the obligors. The obligors did not present a viable case under Georgia law.[11]

**10.** As a general proposition under Georgia law, an action for fraud cannot be predicated upon statements which are promissory in their nature as to future acts. *S & S Builders, Inc. v. Equitable Investment Corp.*, 219 Ga. 557, 564, 134 S.E.2d 777 (1964); *Jackson v. Brown*, 209 Ga. 78(2), 70 S.E.2d 756 (1952). But an action for fraud may in some cases be based upon the misrepresentation regarding such future act when the defendant *knows* that the future event will not take place. *Hayes v. Hallmark Apartments*, 232 Ga. 307, 308–09, 207 S.E.2d 197 (1974). Intent is apparently irrelevant in fraud cases predicated upon failure to make future loans as promised. *See Bonner v. Wachovia Mtg. Co.*, 142 Ga.App. 748, 750 [236 S.E.2d 877] (1977). In any event, the obligors do not claim such a knowing or intentional misrepresentation because their brief labels the fraud in this case as "constructive fraud" which to the obligors means "a material misrepresentation was made by the representatives of HMC, *innocently*." (emphasis added). This case, according to the obligors' statements, does not fall within the class of cases

for which fraud may be proved by showing a present intent to dishonor the promise to undertake a future act or present knowledge of the impossibility of an opinion.

**11.** We might also note that we have some doubt whether the obligors could show the requisite due diligence as is required under Georgia law. *See Dorsey v. Green*, 202 Ga. 655, 659, 44 S.E.2d 377 (1947); *Lariscy v. Hill*, 117 Ga.App. 152, 153–54, 159 S.E.2d 443 (1968); *Scott v. Fulton National Bank*, 92 Ga.App. 741, 744, 89 S.E.2d 892 (1955); *Funding Systems Leasing Corp. v. Pugh*, 530 F.2d 91, 94 (5th Cir. 1976); *Hannah v. Belger*, 436 F.2d 96, 99 (5th Cir. 1971); *United States v. Northeast Construction Co.*, 298 F.Supp. 1135, 1140–41 (S.D. Ga.1969); *see also* Ga.Code Ann. §§ 37–211, 37–212; *cf. Citizens & Southern National Bank v. Arnold*, 240 Ga. 200, 201–02, 240 S.E.2d 3 (1977). We think it inappropriate to base our holding on this ground when the FDIC as movant for summary judgment has not put the point in issue. But a fair reading of the record appears to disclose no efforts by the obligors to

For these reasons, the district court correctly granted summary judgment for the FDIC on the issues of liability on the note and the obligors' various counterclaims and defenses.[12] Having reached this decision on a reading of Georgia law, we need not decide whether federal policy would bar the obligors' claims if the state law would have permitted such claims. In particular, we need not decide whether 12 U.S.C. § 1823(e) or federal common law protects the FDIC from viable recoupment claims based on fraudulent inducement allegations.[13]

### 3. Usury

The obligor-defendants also appeal the district court's striking of the defense of usury. The obligors contended that the interest charged by the Hamilton National Bank from October 25, 1975, the date that a 91.48% interest in the note was assigned to the bank, until February 6, 1976, when the FDIC acquired that interest, was usurious. The interest under the note apparently ranged from 10½% to 11½% during this period. The obligors' sole claim has always been that the allowable interest was controlled by Tennessee's 10% maximum rate after the bank received the interest in the note. Former Tenn.Const. art XI, § 7; former Tenn.Code Ann. § 47–14–104. There was no contention in the district court nor on this appeal that the interest was usurious under Georgia law. The district court's holding that Tennessee usury limits do not apply to the interest on this note and the court's consequent striking of the usury defense draws the obligor-defendants' appeal. We affirm.

The obligors first argue that Tennessee usury law applies through the operation of the National Bank Act:

Any [national banking] association may receive, reserve and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidence of debt, interest at the rate allowed by the laws of the State, Territory, or district where

verify the statements by Hamilton Mortgage which allegedly proved crucial and prompted the obligors' reliance.

The obligors did once claim that there existed a conspiracy to keep from them the knowledge of Hamilton Mortgage's shortcomings. But this action transpired after the making of the loan and the obligors did not raise on this appeal any error in the district court's grant of summary judgment against them with respect to this conspiracy claim.

12. The obligors also discuss an alleged failure of consideration for the making of the note. It is unclear from their briefs whether appellants consider this argument to be separate from the fraud claim. It is without merit, in any event. This Court is convinced that when Hamilton Mortgage advanced over one million dollars to be used to pay off the obligors' old debts it brought itself under the Georgia law holding that the payment of an antecedent debt constitutes adequate consideration for a note. See Ga.Code Ann. § 109A–3–408 (Harrison 1979); Berry v. Atlas Metals, Inc., 152 Ga.App. 437, 439, 263 S.E.2d 179 (1979); Smith v. Rothstein, 131 Ga.App. 632, 633, 206 S.E.2d 592 (1974). Moreover, to the extent that the claimed value of the bargain was lost to the obligors when Hamilton Mortgage lost its ability to loan further funds, we should note that the "promise" upon which the obligors rely was enforceable in any event and a failure to loan an additional amount is not failure of consideration discharging obligors from liability for amounts ad-

vanced. See Crider v. First National Bank, 144 Ga.App. 536, 241 S.E.2d 638 (1978). See also FDIC v. Lauterbach, 626 F.2d 1327, 1338–39 (7th Cir. 1980).

13. Our failure to put this case on that ground does not indicate that our answer to that question would be negative. Although there is authority holding that the FDIC is subject to the defense of fraud in the inducement, FDIC v. Webb, 464 F.Supp. 520, 525 (E.D.Tenn. 1978), there is also authority holding that the FDIC takes its interest free of such defenses either because § 1823(e) gives the FDIC the same protection available to a holder in due course, FDIC v. Rockelman, 460 F.Supp. 999, 1003 (E.D.Wis.1978), or because federal common law requires such a result in light of the strong federal policies favoring uniform federal protection of this sort, Gunter v. Hutcheson, 492 F.Supp. 546, 554–56 (N.D.Ga.1980). Without entering a holding on this ground we simply note that, to this Court, an assertion of this defense against the FDIC seems merely to convert a claim of breach into a claim of fraud. If an obligor may successfully void a note and recoup damages against the FDIC based on a claim of fraudulent inducement from an unwritten agreement, he will have made an end run around § 1823(e) by asserting as fraudulent the same unwritten agreement of which a breach resulting in damages may not under § 1823(e) be asserted against the FDIC.

the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank to the Federal reserve district where the bank is located, whichever may be the greater, and no more, except that where by the laws of any State a different rate is limited for banks organized under state laws, the rate so limited shall be allowed for associations organized or existing in nay such State under this chapter.

12 U.S.C. § 85. They claim that the entire interest must be forfeited under the usury penalty of 12 U.S.C. § 86. They contend that Hamilton National Bank's acceptance of a partial assignment of the note brings that Act into operation because the bank charged and reserved the interest in question. The Act provides that national banks may charge interest rates permitted in the state of their location. Such a rule has been applied to interstate loans made by national banks doing business with residents of states with lower permissible levels of interest. *See Marquette National Bank v. First of Omaha Service Corp.*, 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978). All parties apparently agree that Hamilton National Bank was located in Tennessee. Hence the obligors argue that the interest accruing on the note while it was held by the bank was impermissibly high because the interest exceeded the Tennessee 10%

level. The district court, however, concluded that the statute mandated the application of Georgia law and, thus, struck the obligors' defense of usury.

The FDIC argues that the National Bank Act is inapplicable because the loan was made originally and serviced by Hamilton Mortgage Corporation, which according to the participation agreement was only then to pay interest to the bank. Absent a national bank collecting the alleged usurious interest, the FDIC contends that the National Bank Act is irrelevant. In addition, the bank only later, after the making of the loan, took part of the note as a partial assignment.

■ The district court assumed that the Act applied to this transaction. The district court correctly concluded that Georgia law determines whether this note was usurious. The obligors contend that 12 U.S.C. § 85 controls this case because the Hamilton National Bank was an assignee of a partial interest in the present note. Under these circumstances, the Tennessee interest limit of 10% does not apply because a transfer of a pre-existing debt to a national bank does not cause the National Bank Act to mandate the application of the usury law of the state where the national bank is located.[14] Although the statute does apply to usurious discounting of a note by a national bank or to usurious loans disguised as purchases of notes from an intermediary, such does not

**14.** We interpret this rule to be the prior holding of this Court. *Compare Lafayette Royale Apartments, Inc. v. Meadow Brook National Bank*, 397 F.2d 378, 381 (5th Cir. 1968) *and Meadow Brook National Bank v. Massengill*, 427 F.2d 1055, 1060–61 (5th Cir. 1970) *with Meadow Brook National Bank v. Recile*, 302 F.Supp. 62, 71–76 (E.D.La.1969). The *Massengill* Court applied Louisiana law without referring to 12 U.S.C. § 85 or the law of the state where the National bank was located. Clearly the Court was aware of that provision because the obligors urged the *Recile* opinion on the Court. Rejecting the applicability of the *Recile* finding, of a loan rather than a purchase of a pre-existing note, on the facts before it, the *Massengill* Court turned to Louisiana law. This failure to cite 12 U.S.C. § 85, we interpret, as an implicit holding that, as between the maker of a note and a national bank that acquires that pre-existing note, that provision does not apply.

The subsequent holding of *Marquette National Bank v. First of Omaha Corp.*, 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978), clearly upsets the *Recile* holding that, even when there is a loan rather than the purchase of a pre-existing note, § 85 does not apply to loans made outside a National bank's state of location. The bank in *Recile* was located in New York, and the *Recile* court applied Louisiana law. The *Marquette National* opinion would mandate the application of New York rather than Louisiana usury laws on the *Recile* facts, because the bank was held to have made an interstate loan.

Although one specific holding of *Recile* is now overruled, the impact of the two Fifth Circuit decisions involving the Meadow Brook National Bank apparently remains. Their holdings rest on the preliminary issue of whether the transaction was a purchase of a note rather than a loan and thus they do not share *Recile*'s flaws in interpreting 12 U.S.C. § 85.

appear to be the present case where the obligors do not claim that the bank either discounted the note or was the lender.[15] Applying normal choice of law rules to the present case, we think the Georgia usury laws should guide this Court and the note, initially non-usurious, remains so.[16] The non-usurious character of a note should not

---

**15.** This Court has faced such a question in the sense that it has heard a suit under 12 U.S.C. § 85 where the maker of a note challenged a usurious discount of the note to a National bank from the original obligee. *Daniel v. First National Bank*, 227 F.2d 353 (5th Cir. 1955), *rehearing denied with opinion*, 228 F.2d 803 (1956). The Court held that the maker could recover against the bank. The Court held that what appeared to be a "time price" sales contract sold at a discount to the bank by the original obligee was really a loan to which the bank was privy from the start. Thus, the transaction was usurious from the start and the bank was the actual lender. The Court recognized that what was nominally a discount was either in fact a disguised loan by the bank or a usurious loan originally which the bank by its close association to the original transaction knew was flawed. It also apparently agreed that a usurious discount if made with respect to an otherwise legal note would be the loss of the previous obligee and not the maker. *See* 227 F.2d at 355–57, 228 F.2d at 805–07. The present case differs from *Daniels* in that here the obligors assumed that the allegedly usurious instrument called for non-usurious interest when held by the initial obligee and the obligors have never claimed that Hamilton National Bank was the lender in fact.

**16.** We think it clear that a conflict of laws analysis unaffected by the National Bank Act provision, but with the FDIC remaining as plaintiff, would result in an initial reference to Georgia, rather than Tennessee, usury law.

This Court has jurisdiction over this case under 28 U.S.C. § 1331(a) and 12 U.S.C. § 1819. Because it is such a federal question case where substantive law is to some extent applicable, this federal court is not necessarily compelled by prior diversity action precedent to apply the choice of law rules of the forum state, which is Georgia. *See generally Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Instead, we would face a question that has been often reserved. P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *Hart and Wechsler's The Federal Courts and the Federal System* 829 (2d ed. 1973). *See UAW v. Hoosier Cardinal Corp.*, 383 U.S. 696, 705 n. 8, 86 S.Ct. 1107, 1113 n. 8, 16 L.Ed.2d 192 (1966); *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 456 [62 S.Ct. 676, 678, 86 L.Ed. 956] (1942); *Fahs v. Martin*, 224 F.2d 387, 398 (5th Cir. 1955).

This Court has recently indicated its views regarding this general question when it stated that: "When disposition of a federal question requires reference to state law, federal courts are not bound by the forum state's choice of law rules, but are free to apply the law considered relevant to the pending controversy." *Matter of Crist*, 632 F.2d 1226, 1229 (5th Cir. 1980). *See also* 1A (Pt. 2) *Moore's Federal Practice* ¶ 0.325, at 3406–13 (2d ed. 1981). Such an observation need not mean that a federal rule is always applied, and this Court in the bankruptcy context, has also recognized that there may be issues which should be resolved by application of the forum state's choice of law rules even where a federal court, in a federal question case, is free to do otherwise. *Woods-Tucker Leasing Corp. v. Hutcheson-Ingram Development Co.*, 642 F.2d 744, 748 n.8 (5th Cir. 1981). *See also* Note, *Applicability of State Conflicts Rules When Issues of State Law Arise in Federal Question Cases*, 68 Harv.L.Rev. 1212, 1218–22 (1955). In discussing a situation with some relevance to this case the *Woods-Tucker* Court stated that:

> The claim that the transaction is unenforceable as usurious under the law of the forum presented here would seem to be a case in point—the determination of whether usury prevents enforcement of the claim should not vary depending upon whether the defense is raised in a state or instead a federal court of the forum. At bottom, the issue presents a question that is "independent of bankruptcy and precedes it." *Vanston, supra* 329 U.S. at 169, 67 S.Ct. at 243 (Frankfurter, J. concurring), and that should be resolved in a manner that is not inconsistent with the resolution that would have occurred had the bankruptcy proceeding not intervened.

642 F.2d at 748 n.8. The *Woods-Tucker* Court avoided the question of whether to follow *Klaxon* or follow an independent federal rule by deciding that under either the state or federal test the same result would obtain. *Id.* at 749. Although the *Woods-Tucker* Court did not decide whether it was bound by *Klaxon* or was free to choose the law it considered relevant, that question was apparently decided by this Court in *Crist*, 632 F.2d at 1229. The subsequent statements in *Woods-Tucker* can therefore be taken to mean that this Court should, if pushed to the question, be free to choose the applicable choice of law rule but, for the reasons stated above, apply the forum rule in some cases.

Given the *Crist* decision, the *Woods-Tucker* policy of adopting state choice of law rules in some cases makes good sense. Professor Moore advocates that if the federal policies do not refer to state law, "the court should apply a rule of substantive law—including the conflict rules—wholly independent of state law." 1A *Moore's Federal Practice* at 3412–13. But

change when the note changes hands.[17] Because of this holding we do not find it necessary to determine, as the district court did, that the National Bank Act, 12 U.S.C. § 86 also results in the application of Georgia law.[18] The district court's ultimate ap-

there is really no need to adopt a federal rule at the choice of laws stage of a case such as the present one. First, the rights of the FDIC may be vindicated on completely state law grounds, making the invocation of federal policy unnecessary. Second, such policy can effectively decide the crucial and ultimately dispositive issues in the case at a later stage, for instance, by holding that the federal policy overrides the state substantive law initially adopted. Third, the same result may be reached under either conflicts rule. Fourth, it is difficult to understand how a reasonable and facially neutral state choice of law rule can disfavor federal policy except in the happenstance choice of an unfavorable state law that was selected on principles completely independent from and neutral with respect to the federal policy. Finally, in usury cases it would be less desirable to have an unpredictable substantive result for the sake of applying a uniform federal conflicts rule in every case. *See Fahs v. Martin*, 224 F.2d 387, 396 (5th Cir. 1955). For these reasons, this Court would next turn to Georgia conflicts laws.

Under the Georgia law, it is clear that Georgia usury law would apply. The contract was executed and to be performed in Georgia, with payment to be made to Hamilton Mortgage in Savannah. The land which was the subject of the security deed was in Georgia. The obligors were also Georgians. The sole Tennessee connection of this transaction is the fact that Hamilton Mortgage and Hamilton National Bank were apparently Tennessee corporations.

Under these circumstances, Georgia courts would apply Georgia law. The Georgia legislature has provided that:

Every contract shall bear interest according to *the law of the place of the contract*, unless upon its face it shall be apparent that the intention of the parties referred the execution of the contract to another forum; in this case, the law of the former should govern. Ga.Code Ann. § 57–106 (Harrison 1977) (emphasis added). This has been interpreted as a choice of law provision which determines which state's usury laws are controlling. And the choice of law rule as fleshed out by the Georgia courts would hold, that where 1) the land held by security deed is in Georgia; 2) the contract was executed in Georgia; and 3) the contract was made payable in Georgia, the Georgia law of usury would apply as Georgia is the place of performance of the contract. *First National Bank of Quitman v. Rambo*, 143 Ga. 665, 668–69, 85 S.E. 840 (1915); *Byrd v. Equitable Life Assurance Soc'y*, 185 Ga. 628, 639–40, 196 S.E. 63 (1938); *see Taylor v. American Freehold Co.*, 106 Ga. 238, 246–47, 32 S.E. 153 (1898); *Underwood v. American Mortgage Co.*,

97 Ga. 238, 240, 24 S.E. 847 (1895). The same conclusion would still follow from those cases even if the note was made payable in Tennessee. Weightier factors must favor the application of a foreign state's law before Georgia courts will conclude that the parties attempted to make a non-Georgia contract. For example, where the land providing the security is in Georgia that factor may be offset by such facts as execution and payment in a foreign state and that state's law may control. *See Clark v. Transouth Financial Corp.*, 142 Ga.App. 389, 390, 236 S.E.2d 135 (1977); *Jones v. Lawman*, 56 Ga.App. 764, 770, 194 S.E. 416 (1937). Thus, by any reasonable interpretation of Georgia conflicts law, the Georgia courts would consider the present note to have been intended to be a Georgia note, to be measured under Georgia usury laws, which although not discussed by either side, would apparently hold that the present loan was not usurious to the debtor corporation or the individual guarantors. *See* Ga.Code Ann. §§ 57–118, –119; *Rothstein v. First National Bank of Atlanta*, 239 Ga. 216, 217, 236 S.E.2d 350 (1972); *Mercantile National Bank v. Berger*, 129 Ga.App. 707, 709, 200 S.E.2d 921 (1973); *Waterman v. Howard Paper Co.*, 124 Ga.App. 511, 512, 184 S.E.2d 226 (1971). In fact, Georgia is the only state with any interest in the case because all the parties (aside from the FDIC) are Georgia residents who ironically strain to argue for the application of Tennessee law.

This analysis sufficiently shows that under any common theory of choice of state law, the applicable usury law would be that of Georgia.

**17.** This Court long ago observed that: "If, in its inception, the contract which that instrument purported to evidence was unaffected by usury, it was not invalidated by a subsequent transaction." *Huntsman v. Longwell*, 4 F.2d 105, 106 (5th Cir. 1925). This proposition was articulated by the Supreme Court as one of the "cardinal rules in the doctrine of usury." *Nichols v. Fearson*, 32 U.S. 103, 109–11, 8 L.Ed. 623 (1833).

**18.** Despite our belief that we need not reach this question, we do note that the obligors' claim that Tennessee usury law applies, whenever a National bank in Tennessee holds an interest in a note made in another state appears untenable. The obligors' primary reliance is placed on a literal interpretation of *Marquette National Bank v. First of Omaha Service Corp.*, 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978), where the court held that 12 U.S.C. § 85 applied to interstate loans and that a bank, located in one state, loaning money in a second

plication of Georgia usury law, however, was correct.

## Conclusion

We reject all the obligors' appellate arguments. The FDIC's statutory protection does apply in this case to shield it from asserted unwritten side agreements. The fraudulent inducement claim, which, rather than asserting the alleged oral agreements as valid, would use many of the same facts to prove fraud invalidating the written note, is not viable under state law. Finally, Tennessee usury law does not apply to this note or interest and, therefore, the FDIC is not prevented on this ground from collecting either. In short, the judgment of the district court is AFFIRMED.

THOMAS A. CLARK, Circuit Judge, specially concurring:

I concur specially in the majority opinion for the reasons set forth in my specially concurring opinion in *Chatham Ventures, Inc., et al. v. FDIC*, 651 F.2d 355 (5th Cir. 1981).

state may charge interest at the rate allowed by its state of location.

The obligors' arguments that, under 12 U.S.C. § 85, the Hamilton National Bank being located in Tennessee may only have held notes bearing 10% interest cuts against the rule of validation generally applicable to allegedly usurious contracts with a substantial relation with more than one state. *See Fahs v. Martin*, 224 F.2d 387, 397 (5th Cir. 1955). The Tennessee courts apparently would apply this rule to interstate contracts such as the one in the present case. *See Bowman v. Price*, 143 Tenn. 366, 226 S.W. 210 (1920); *Denton v. Vise*, 186 Tenn. 364, 210 S.W.2d 665, 669–79 (1948). *See also In re Leeds Homes, Inc.*, 222 F.Supp. 20, 30 (E.D.Tenn.1963), *aff'd*, 332 F.2d 648 (6th Cir. 1969). In fact, the validation rules would be particularly appropriate in this case where Tennessee has no interest in protecting Georgia borrowers from usury. The obligors' argument, thus, appears to undercut the purpose of the National Bank Act which was designed to enhance the competitiveness of national banks. *See Marquette National Bank*, 439 U.S. at 314, 99 S.Ct. at 548.

Under these circumstances, if we directly faced this question, we might well agree with the district court which found that a National bank making a loan in a foreign state, where higher interest rates are allowed to state banks, may charge the higher foreign rate, because the bank could then be said to "exist" in that foreign state. *See Fisher v. First National Bank*, 548 F.2d 255, 257–58 (8th Cir. 1977); *Fisher v. First National Bank*, 538 F.2d 1284, 1290–01 (7th Cir. 1976); 12 U.S.C. § 85; Ga. Code Ann. §§ 41A–1313; 57–101 *et seq.*

This discussion further confirms our view that an acquisition of a pre-existing note by a National bank does not alter the usury limits applicable to this note when the National bank is located in a state with more restrictive laws than the state where the note was made. Although on the facts as alleged by the appellants the Hamilton National Bank might be said to "exist" in Georgia in the sense used by the *Fisher* courts, a purchaser of a note might often have no contacts with a state of the making and be completely unsusceptible to such a characterization. Congress surely did not intend to disadvantage National banks in that manner.