723 F.Supp. 1258 (1989)
PEOPLE of the State of Illinois ex rel. Neil F. HARTIGAN, Attorney General of Illinois, Plaintiff,
v.
COMMONWEALTH MORTGAGE CORPORATION OF AMERICA, et al., Defendants.
Federal Savings and Loan Insurance Corporation, etc., Intervenor.
No. 89 C 2752.
United States District Court, N.D. Illinois, E.D.
September 13, 1989.
*1259 Kathleen Dravillas, Asst. Atty. Gen., Chicago, Ill., for plaintiff.
Leon E. Lindenbaum, Lindenbaum, Coffman, Kurlander, Brisky & Hayes, Ltd., Chicago, Ill., for defendants.

MEMORANDUM OPINION AND ORDER
SHADUR, District Judge.
In this statutory enforcement action, Illinois Attorney General Neil Hartigan initially filed a two-count Complaint in the Circuit Court of Cook County on behalf of the People of the State of Illinois[1] against Commonwealth Mortgage Corporation of America ("Commonwealth") and certain of its officers, alleging violations of:
1. the Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121-½, ¶¶ 261-272 (Count I) and
2. the Uniform Deceptive Trade Practices Act, id. ¶ 312 (Count II).
Commonwealth is a wholly-owned subsidiary of Commonwealth Savings Association ("Association").
On March 8, 1989 Federal Home Loan Bank Board appointed Federal Savings and Loan Insurance Corporation ("FSLIC") as Association's conservator and Federal Deposit Insurance Corporation ("FDIC") to provide management services for FSLIC's conversatorship. FSLIC then intervened to supplant Commonwealth as defendant in this action and removed it to this District Court.
In part the Complaint seeks restitution of certain sums from the defendantoriginally Commonwealth but now FSLIC. In light of FDIC's entry into the case, this Court directed the parties' attention to the potential application of the doctrine announced in D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). It therefore requested briefing pursuant to Fed.R.Civ.P. ("Rule") 16 to determine whether the issues might be simplified by eliminating any claims or defenses barred by the D'Oench doctrine. For the reasons stated in this memorandum opinion and order, this Court finds D'Oench indeed precludes any claim for recovery  on any theory  based on oral misrepresentations by Commonwealth or its agents or employees.

Plaintiff's Claims
Plaintiff charges a scheme by Commonwealth to take advantage of home buyers and homeowners during the refinancing boom caused by declining mortgage rates *1260 in 1986-87. Commonwealth is alleged in Complaint ¶ 10 to have enticed a large number of consumers to enter into loan transactions by offering to "lock in" interest rates and points as of the date of an initial agreement, provided the loan closed by a certain date. Commonwealth's wrongful and fraudulent conduct in promoting and carrying out that scheme is said to have included:
(1) representing that a specified interest rate and number of points would be locked in for a set period of time, when in fact they were not;
(2) representing that the consumers would receive their loans within a certain time period, while failing to provide the loans on that timetable;
(3) representing that loan applications would be processed within a certain period of time, when Commonwealth could not reasonably have expected to do so;
(4) furnishing a "Good Faith Estimate of Settlement Charges" and failing to advise that it was not a loan commitment;
(5) representing that loans had been approved at certain interest rates and numbers of points, then failing to close the loans on those terms;
(6) advertising and offering unrealistic or impossible interest rates and points;
(7) advertising and offering the closing of loans within unrealistic or impossible time periods;
(8) failing to maintain an office and staff reasonably adequate to handle business efficiently;
(9) failing to give timely notice of its inability to close loans within lock-in periods;
(10) failing to disclose that it was acting as a broker rather than a lender of funds; and
(11) refusing to refund application fees when loans were not closed due to its own wrongful conduct.
In addition to the Complaint, FSLIC has tendered, as its Mem. Exs. 1 and 2, copies of the standard "lock" agreement, and the standard "rate/point lock" document reflecting the agreement that was retained as part of Commonwealth's internal files.

D'Oench Doctrine
D'Oench, 315 U.S. at 459, 62 S.Ct. at 680 confirmed the existence of a federal policy:
to protect [FDIC] from misrepresentations made to induce or influence the action of [FDIC], including misstatements as to the genuineness or integrity of securities in the portfolios of banks which it insures or to which it makes loans.
To that end D'Oench, id. at 460, 62 S.Ct. at 681 announced the following standard as to a note claimed to have been given without any consideration and with the understanding that the note would not be sued upon:
The test is whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which [FDIC] relied in insuring the bank was or was likely to be misled.
Despite the limited context in which D'Oench was announced and the restricted scope of its quoted pronouncement, the rationale that produced D'Oench has since been expanded in a number of ways. For one thing, courts have consistently extended the D'Oench concept to protect FSLIC as well as FDIC (see, e.g., Mainland Savings Association v. Riverfront Associates, Ltd., 872 F.2d 955, 956 (10th Cir.1989) (per curiam) and cases cited there).[2] Similarly, even though the D'Oench doctrine has been codified in 12 U.S.C. § 1823(e) ("Section 1823(e)")[3] as to FDIC alone, the case *1261 law uniformly treats decisions interpreting that statute as persuasive in determining the scope of protection to be afforded FSLIC too. Thus FSLIC v. Murray, 853 F.2d 1251, 1254 (5th Cir.1988) said, despite the facial applicability of both D'Oench and Section 1823(e) to FDIC only and not to FSLIC:
While neither Congress nor the Supreme Court has extended these protections to FSLIC, we see no reason to treat these regulatory authorities differently. We agree with the Sixth Circuit that D'Oench and its progeny protect FDIC and FSLIC alike against arrangements "likely to deceive a federal regulatory authority." Taylor Trust v. Security Trust Fed. Savings & Loan Ass'n, Inc., 844 F.2d 337, 342 (6th Cir.1988).
At least as importantly for current purposes, the policy notions underlying D'Oench have been applied far more broadly than its narrow origins would suggest  its sweep now extends to any private understandings not memorialized in the lender's files. Thus, although D'Oench itself prevented a maker from asserting defenses against enforcement of a note, its principle applies with equal force to bar a maker from advancing affirmative claims of relief against FDIC or FSLIC. As FDIC v. Lattimore Land Corp., 656 F.2d 139, 146 n. 13 (5th Cir.1981) pointed out, any other result would permit an "end run" around the D'Oench-Section 1823(e) concept. No party should be entitled to affirmative relief against FDIC if it would be foreclosed from asserting the same facts as a defense against FDIC's attempt to collect.
Also in terms of its general applicability, while D'Oench dealt directly with FDIC in its corporate capacity, the cases apply the doctrine when FDIC acts as a receiver as well (see, e.g., FDIC v. McClanahan, 795 F.2d 512, 514 & n. 1, 516 (5th Cir.1986)). And finally as to the doctrine's scope, P.R. Mem. 4 concedes that Commonwealth's status as a subsidiary of the entity taken over by FSLIC, rather than the entity itself, does not affect the relevance of D'Oench.
In summary, plaintiffs are fully subject to the potential impact of the D'Oench doctrine. This opinion therefore turns to the issue whether that doctrine blocks all or any part of this lawsuit in substantive terms.
As already indicated, D'Oench, 315 U.S. at 460, 62 S.Ct. at 680 held that a "secret agreement" as to a note's unenforceability (including the lack of consideration for its issuance) could not be a defense because it would tend to deceive the banking authorities. Section 1823(e) clarified what constitutes such a non-assertable secret agreement by permitting enforcement only of agreements that are in writing and that have been official records of the bank since their execution.
More recently D'Oench has been reaffirmed and significantly extended in Langley v. FDIC, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987).[4]Langley, id. 108 S.Ct. at 402 held the doctrine applies even where there is fraud in the inducement of the note (so that the borrower has no active culpability in the matter) and even where FDIC has knowledge of the asserted defense when it acquires the note:
Certainly, one who signs a facially unqualified note subject to an unwritten and unrecorded condition upon its repayment has lent himself to a scheme or arrangement that is likely to mislead the banking authorities, whether the condition consists of performance of a counterpromise (as in D'Oench, Duhme) or of the truthfulness of a warranted fact.
*1262 Clearly D'Oench and Langley foreclose any relief in plaintiffs' favor against FSLIC based on oral misrepresentations made by Commonwealth in obtaining the loan agreements. Nor is the good faith of an ultimately-defrauded borrower of any moment, as long as the borrower bears some responsibility for the creation of the note (see, e.g., RSR Properties, Inc. v. FDIC, 706 F.Supp. 524, 531 n. 9 (W.D.Tex.1989)).[5] Even any knowledge of those misrepresentations on FSLIC's part would be equally irrelevant (Langley, 108 S.Ct. at 402-03).
Hence any damages or other relief based on oral misrepresentations not contained in the official Commonwealth records must be considered unavailable to plaintiffs under D'Oench-Langley. By contrast, if and to the extent any alleged limitations on enforceability were reflected in Commonwealth's written records as part of an agreement with a borrower, claims asserting those limitations would remain viable.
At this stage of the proceeding this Court has not been provided with information as to all the contents of the relevant written records, but the nature of the Complaint suggests they would comprise:
1. any notes and mortgages signed by loan applicants who ended up as actual borrowers; and
2. any loan agreements and "rate-point lock" agreements (exemplified by D. Mem. Exs. 1 and 2) signed by those applicants and perhaps by other applicants who claim damages for non-completion of the bargained-for loan transactions.
Although it would of course be inappropriate to render an advisory opinion on the matter before the documentation and this opinion's impact are made plain, a few preliminary comments are in order.
Plaintiffs clearly do not contend any loan agreement itself contains written evidence of fraud  rather the assertion is that consumers were fraudulently induced or coerced into signing such agreements. Similarly, any conventional note and mortgage combination is ordinarily self-contained  each cross-referencing the other, but neither likely to contain any internal evidence of fraud either. Thus the just-stated characterization of the loan agreements would seem equally applicable to any notes and mortgages. And finally, it is difficult to perceive how any claim based on the "rate-point lock" agreements might be sustained in the face of D'Oench and Langley.[6]

Conclusion
Attorney General Hartigan has the burden  with the benefit of reasonable factual inferences  of explaining the basis (if any) on which any claims arising out of misrepresentations allegedly made to consumers by Commonwealth can survive against FSLIC under the D'Oench-Langley doctrine. This action is set for a status hearing at 8:45 a.m. September 28, 1989 to *1263 discuss the future course of this litigation in that light.
NOTES
[1] Although one of the state statutes invoked by Attorney General Hartigan vests him with such enforcement powers (see Ill.Rev.Stat. ch. 121-½, § 267), that is not true of the second statute (which grants relief only to "[a] person likely to be damaged by a deceptive trade practice of another" (id. § 313)  hardly a description that fits the Attorney General himself). Hence it would seem that his second claim would have to be sustained (if at all) as a parens patriae action. Any such asserted claim would normally call for resolution of the Article III "case or controversy" question as to whether the Attorney General or the People has or have standing to maintain the claim (see, e.g., Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982)). In this case, although the Complaint is framed in terms of representation of the "People" generally, the Attorney General's answers to interrogatories speak only of 50 loan applicants actually sought to be victimized by the complained-of conduct, not all of whom actually succumbed to the asserted misrepresentations described later in the text (D.Mem. 3-4). So limited a focus, without more, could pose serious jurisdictional problems under Snapp, perhaps calling for a remand of the second asserted claim (advanced in Count II). But in this instance Count II raises no issues and seeks no remedies that are not already involved in Count I, which poses no such Article III jurisdictional difficulties. Under those circumstances, there appears to be no point in addressing the Count II "case or controversy" question.
[2] P. R. Mem. 3-4 concedes that.
[3] Section 1823(e) reads:

Agreements against interests of Corporation No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.
[4] It is true that Langley was a Section 1823(e) case, but this opinion has already addressed the equal relevance of such cases in the commonlaw context. If anything, the D'Oench doctrine sweeps more broadly than Section 1823(e) (see this Court's opinion in FDIC v. Linn, 671 F.Supp. 547, 555 (N.D.Ill.1987)).
[5] To the extent that pre-Langley decisions spoke in such terms as applying D'Oench "if the maker of a note lends himself to a fraudulent scheme which is likely to mislead the banking authorities" (see, e.g., FDIC v. Investors Assoc. X., Ltd., 775 F.2d 152, 155 & n. 4 (6th Cir.1985)), they call for a greater degree of borrower involvement than the Supreme Court has now made clear is required (Langley, 108 S.Ct. at 401-02). Thus the limited borrower responsibility described in the text of this opinion more accurately reflects the current teaching of the Supreme Court. Somewhat relatedly, FDIC v. Turner, 869 F.2d 270, 273-76 (6th Cir.1989) articulates a distinction between so-called "personal" defenses (held there to be barred by D'Oench) and "real" defenses (held not so barred). Whatever the validity of that limitation on D'Oench may be (a matter on which this Court expresses no view), it would not affect the result here  the claim here surely falls within the "personal" defense category in that dichotomy.
[6] Although this Court may have the power to grant summary judgment sua sponte, that would certainly be ill-advised given the absence of factual information as to all the potentially relevant documents. Indeed, this Court has never taken (or even considered) such action when the parties have not had the opportunity to conduct relevant discovery. Nor have the parties been adequately informed that a summary judgment ruling was impending (see Celotex Corp. v. Catrett, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)).