**In re Elmer D. WERTH, Taxpayer No. 521–30–0029, Debtor.**

**Bankruptcy No. 80 B 3483 M.**

United States Bankruptcy Court, D. Colorado.

Jan. 31, 1984.

Harold A. Feder, of Feder, Morris & Tamblyn, Denver, Colo., for debtor.

John F. Head, of Head & Moye, Denver, Colo., for creditor, IntraWest Bank of Denver.

## MEMORANDUM OPINION AND ORDER

### DEBTOR'S OBJECTION TO CLAIM NO. 39

JAY L. GUECK, Bankruptcy Judge.

## I. INTRODUCTION

IntraWest Bank of Denver (formerly the First National Bank of Denver, (hereinafter "IntraWest" or "Bank")) filed a proof of claim as an unsecured claimant in the personal bankruptcy of Elmer D. Werth (hereinafter "Werth"). This claim is denominated as Claim No. 39, and is for approximately $525,630.00 plus accrued interest. The claim is based upon a continuing personal guarantee given by Werth to IntraWest to secure payment of crop loans made to Fairview Farms, Inc. (hereinafter

"Fairview" or the "Farm"), an entity in which Werth was a 50% stockholder.

Werth objected to the claim of the Bank pursuant to 11 U.S.C. Sec. 502(b)(1). Generally, the debtor argues that the claim should be disallowed, based upon breach of contract, breach of trust and promissory estoppel. The Bank contends that Werth is barred from objecting to its claim by res judicata, collateral estoppel, lack of standing, waiver, equitable estoppel, unclean hands, failure of consideration, failure of condition and false representations. In effect, Werth, as guarantor of the principal obligor, Fairview Farms, seeks to use the defenses of the principal obligor to avoid liability to IntraWest.

## II. FINDINGS OF FACT

On August 19, 1980 Werth filed for protection under Chapter 11 U.S.C. Sec. 101, et seq.) of the Bankruptcy Code. His wife, Donna Mae Werth, filed on November 20, 1981. The filing concluded a period of complex and tumultuous financial dealings of Werth. Werth is a Vice-President of Special Products and Food Products Acquisition for Coors and has been employed by Coors for 36 years. In the past he invested extensively in real estate, oil and gas, gold mines and coal mine ventures. Some of the entities in which he has been involved, and which were mentioned in this litigation, are the Don-Mark Partnership, Tiempo Enterprises, Eldon, H & R Farms, Futura Properties and the Fogg investment deal. Most importantly, Werth was a 50% shareholder in a large farm located in the San Luis Valley in southern Colorado. This was Fairview Farms. The Farm primarily grew potatoes, wheat and barley. It has an area of approximately 2760 acres on which various improvements are located, including an 80,000 square foot warehouse and related farm processing facilities. Also involved in the operation of the Farm were Allen and Wayne Remington, cousins of Elmer Werth. They were stockholders with Werth in Fairview Farms, Inc.

The real property on which the Farm was located was heavily encumbered. Pruden-tial Insurance Company held a first deed of trust. The Bank held a second deed of trust. Beginning in 1974, IntraWest financed the operation of the Farm through "crop loans". Crop loans were loans whereby the funds advanced were utilized to raise crops, with the loans being repaid annually from proceeds of the harvest. The manner of funding was through overdraft protection. The Farm would negotiate checks in the ordinary course of business and IntraWest would "cover" the checks written through its correspondent bank in the San Luis Valley, the First National Bank of Center. Normally, the loans had a term of one year and were due in the fall, after harvest.

As the years passed, proceeds of the annual harvests were insufficient to retire the yearly debt due to poor harvests, fluctuating crop prices and mismanagement. Thus, the unpaid balances were "rolled over" into loans made for the succeeding years. In June of 1975 the Bank extracted continuing personal guarantees from Elmer and Donna Werth, Wayne and Marilyn Remington and Allen and Janet Remington. In July, 1978, Allen Remington, the Farm manager and an experienced farmer, died in a freak accident. Later, in July 1979, Wayne Remington was discharged when Werth discovered he was embezzling from the Farm. By the end of 1978, the Farm owed IntraWest $2,250,000 in crop loans.

In February, 1979, the Bank was sufficiently concerned about the outstanding indebtedness that it advised Werth no further funding would be forthcoming. The Bank wanted a plan to liquidate the Farm. As Ralph Adams, the loan officer responsible for the loan and the Bank's Policy Administrator, testified, the Bank's primary, if not sole, effort from this time forward was simply to *get paid*. Werth was still trying to salvage the Farm operation and satisfy the Bank's concerns so that continued financing might be obtained. To this end, he hired Acie Gunnels, an experienced farmer, as a farm manager. Gunnels and Danny Cook, the Farm's book-

keeper, began to devise a plan to liquidate, in accordance with the Bank's wishes.

Their efforts persuaded the Bank to rewrite the Fairview Farms loan, which was accomplished on March 26, 1979. This loan was in the amount of $1,750,000. Shortly thereafter, the Bank asked Werth to put up $1,000,000 in personal assets to secure his continuing personal guarantee of that loan. At this time, Werth assigned to IntraWest a second deed of trust he held on real property he once owned at 52nd and Garrison in Arvada, Colorado (hereinafter the "Garrison Property").

In August of 1979 the Farm borrowed $400,000 from the Farmers Home Administration (hereinafter "FmHA") for the 1979 farm operations, under an emergency program. The loan was made only after the FmHA received confirmation from IntraWest that the Bank would not extend a 1979 crop loan. The United States of America, acting through the FmHA, received a deed of trust on the farm and Werth co-signed the promissory note in his individual capacity.

By February of 1980 the Farm had reduced its loan with IntraWest from $2,250,000 to approximately $635,871, due to payments from various sources. The proceeds from the 1979 crop were not sufficient to retire the FmHA 1979 loan. By early 1980 the Farm still owed the FmHA $360,000. The FmHA has filed a proof of claim against Werth personally, based on his co-signing the 1979 note, in the amount of approximately $315,000.

Prospects for financing the 1980 crop were dimmed when the FmHA advised that no 1980 crop loan could be made until the 1979 loan was paid down. Additionally, the Bank again refused to finance the operations of the Farm. Negotiations to sell the property were conducted with various potential purchasers, but none came to fruition.

In late March of 1980, Werth met with Ralph Adams, who had just assumed responsibility for the Fairview Farms loan. Also present were the Farm's bookkeeper, Danny Cook; Werth's attorney, Reid Li-

chtenfels; and Werth's business partner in Futura Properties, Mark Scanlan. The purpose of this meeting was to advise Adams of a potential sale of the Farm to Prudential Insurance Co., the first mortgage holder, and to present projections to the Bank in an effort to secure financing for at least a portion of the 1980 operation.

Subsequently, at the request of Adams, a budget for the 1980 season was submitted to the Bank. The Bank continued to be primarily concerned with prompt repayment and wanted the property liquidated. It was agreed that saleability was enhanced if the Farm had a growing crop. Thus, the Bank was willing to consider funding this crop.

Adams authored a memo on April 21, 1980 outlining Fairview's presentation and recommending a loan in the amount of $675,000, based upon the projections presented and the collateral then held by the Bank.

Adams testified that five conditions precedent were placed on the loan:

(1) That the Farm was to pledge a second deed of trust to the Bank on the potato warehousing facilities;

(2) That an FmHA crop loan was to be obtained for the 1980 season;

(3) That Werth was to secure his personal, continuing guarantee with a deed of trust on his personal residence;

(4) That the Farm was to give to the Bank a second deed of trust on the Farm itself, a second deed of trust on farm equipment not leased and a second deed of trust on the prior year's crops;

(5) That Werth was to give the Bank a pledge of his stock in the Farm and an assignment of a second deed of trust held on the condominium project on the Garrison Property; all other conditions for the then-outstanding loan were to remain intact.

The requirement of an FmHA crop loan was not mentioned in the memo to the file of April 21, 1980. The memo did mention Adams' concern that if the Farm were un-

able to plant a crop and, thus, receive no revenue it "could conceivable (sic) trigger a bankruptcy."

Danny Cook, the Farm's bookkeeper, who was present at the meeting could recall no conditions on the loan. No mention of bankruptcy was recalled, either.

Similarly, Werth specifically testified that no mention was made of the FmHA loan as a condition to the IntraWest loan. Further, he stated there was no indication of an anticipated bankruptcy and no discussion of any "insecure provisions" which might be used to terminate funding.

I find the Bank neither communicated to Werth nor reflected in any intra-office communications presented in evidence any requirement that an FmHA loan for 1980 crops be obtained as a condition to the $675,000 loan by the Bank. Adams may have assumed an FmHA loan would be obtained, but it was not a communicated condition of the IntraWest loan.

The Bank approved the loan, and an oral commitment was made when Adams called Werth in late April or May, 1980 to advise that the loan had been approved. Evidence was introduced showing that Adams had caused the amount to be increased to $750,000, with interest at 3% over prime. Earlier discussions had contemplated 2% over prime. The security required was the security interest in all Fairview Farms land, warehouse, equipment and machinery, and crop proceeds, together with the personal guarantee of Elmer Werth and his pledge of his interest in the Garrison Property, a deed of trust on his residence and a pledge of his stock in the Farm. The loan was to be repaid from the sale of the crop, for which a separate account was opened. In reliance upon this commitment, and pending completion of the paperwork evidencing this loan, personnel of the Farm went about purchasing seed, planting, and operating the farm. Efforts to obtain funds elsewhere ceased.

Disbursements on this new loan were begun through the aforementioned overdraft protection in mid-May, 1980. By May 30, 1980, the sum of $32,284 had been

advanced. As of June 16, 1980, the sum of $108,531 in additional advances had been made. Further advances of $16,280 were afforded by June 20, 1980, for a total of $157,095 as of that date.

On or about June 23, 1980 the Bank terminated all funding on the loan and refused to proceed any further. The uncontradicted testimony was that the Bank's action was without prior notice to Werth or anyone else on behalf of Fairview Farms, without prior explanation and without giving the Farm or Werth a chance to remedy the situation. The cessation of funding was discovered when checks issued by the Farm were returned for insufficient funds. By Adams' own admission, the Bank had felt the loan was substandard, Adams regarded it as a disgrace and, according to one memo he authored, a "snake". Adams knew of the Farm's extensive reliance on the promise of the Bank, he knew of the action taken by the Farm in its continued operation in reliance upon the loan commitment and he perceived that a bankruptcy could occur if the 1980 operations were unable to return a substantial portion of the Farm's debt. Adams also agreed that there was no "insecure clause" in the oral agreement or any discussion of such a right which would justify the action of the Bank.

The evidence reflects that the Farm attempted to procure financing from various alternative sources upon termination of funding by IntraWest. Inquiries were made of the First National Bank in Golden, the First National Bank of Wheatridge and the American National Bank of Montbello. However, in mid-season all available crop funds were committed. By July 1, 1983, the crop was "made", meaning it was in an insurable state, it was growing well and was in need of continued attention so that it could ultimately be sold and return a profit to the Farm. Additionally, drought conditions existed in Idaho which diminished the supply of potatoes in the United States, thereby dramatically raising the price of available potatoes. Werth and others on behalf of the Farm expended exten-

sive efforts attempting to convince the Bank to reinstate the 1980 loan, but all attempts were futile.

The reasons given by Adams on behalf of the Bank in justification of its action terminating funding were varied and not totally consistent.

Adams originally indicated that he became concerned that the "collateral was not as originally represented." This referred to the assignment of Werth's security interest in the Garrison Property. Adams expressed concern that the first mortgage to Megapolitan Mortgage was in default and a foreclosure had been initiated, all of which caused him concern and resulted in termination of the IntraWest funding. However, the evidence overwhelmingly reflects that it was not until very late June or early July of 1980 that the Bank learned of any foreclosure by Megapolitan.

The first date when the Bank might have learned of any difficulty in the Megapolitan loan was June 25, 1980. The Bank had already taken its action to terminate funding on its loan to Fairview Farms. Additionally, it is noted that the Garrison loan was current and Werth did not even learn of any difficulties until June, 1980. Werth's interest had already been pledged to the Bank on approximately April 19, 1980, at which time there was no reason to be concerned about that security interest. In short, it appears the Bank made its decision to cease, and actually accomplished the cessation of, funding to Fairview Farms before it ever learned of any potential difficulty with its security interest in the Garrison Property.

Next, Adams testified the FmHA crop loan was a condition to the IntraWest loan, and he learned the crop loan had not been obtained. However, Exhibit G, dated June 26, 1980, is a letter to Ralph Adams from Asset Management Group on behalf of Fairview Farms. That communication clearly reflects the efforts Fairview Farms was making to accomplish a loan with FmHA and noted that "FHA will begin processing of loan if FNB notifies them of their commitment." It is admitted that the Bank failed to notify FmHA of its commitment. Additionally, the memorandum notes that FmHA advised it would take thirty days to process the application and such application should be made immediately lest funds no longer be available. Adams was also advised of the necessity that funds be forthcoming to avoid shutting down the operation which would result in a total loss of the harvest.

The Bank's own action thwarted any viable effort to obtain a loan from the Farmer's Home Administration and was taken with full knowledge that it would likely result in an inability to obtain that loan, would cause the Farm to be shut down, and the crop to be lost, with the probability that bankruptcy would ensue. It should be noted that FmHA had no loan program available to fund a 1980 loan in any event.

I have previously found that obtaining an FmHA crop loan was not a condition to the IntraWest loan. Further, if it were, IntraWest effectively blocked any further efforts in this regard.

It is also noteworthy that Adams acknowledged that after June, 1980, even if the Farmer's Home Administration had committed to loan $400,000 to Fairview Farms, IntraWest would not have funded its loan. Thus, this cannot be a rational reason for terminating funding of the IntraWest loan.

Next, Adams stated that one of the reasons he determined to pull the loan was that financial statements submitted by Elmer Werth under date of April 8, 1980 and July 3, 1980, were so drastically different that Mr. Adams was "shocked" by the information. This cannot be a reason for termination of funding, since it already occurred before the presentation of Werth's financial statement of July 3, 1980.

In the final analysis, Adams concluded, in response to questioning by the Bank's own counsel, that the "sole reason" he shut down the loan was that he had heard the loan to Megapolitan on the first deed of trust to the Garrison Property was in default. As previously indicated, termination

of funding occurred before the Bank learned of any such problem on the Garrison security.

I shall not speculate on the reason the Bank chose to suddenly stop funding its loan commitment to Fairview Farms. Suffice it to say it was not for any of the reasons proffered by testimony on behalf of the Bank. Further, there is no other cause set forth in the evidence to explain the Bank's conduct.

This requires amplification in the Findings of Fact.

Mr. Gunnels noted that the first checks returned for insufficient funds occurred in the first part of July. He called for Mr. Adams, but received no reply. Gunnels paid these checks from his own resources. This resulted in the agreement (Exhibit I), dated August 4, 1980, which is the Crop Management Agreement granting Gunnels 75% of the net profits from the grain harvest, 80% of the net profits from the potato harvest and 20% of the net proceeds of Fairview Farms in sharecropping arrangements with third parties. This arrangement was totally the result of the Bank's decision to abrogate its agreement to fund the Farm.

Gunnels further testified that in his many years of farming he had never heard of a Bank terminating funding in mid-season. He knew of nothing Werth or Fairview Farms had done to cause the Bank to break its agreement. I accept this testimony.

G. Boyce Baumgardner, a former employee of the First National Bank of Center, IntraWest's correspondent bank, acted as a specialist in farm loans. He advised Ed Salvi, Werth's "personal banker" with IntraWest, that the crop was harvestable and would be profitable and that he knew of no reason to cut off funding. This was a most "unusual" action for a bank to take in mid-season, according to this witness. I accept this testimony.

Ray Fox, the President of the First National Bank of Center, expressed his surprise at IntraWest's action. He "never dared to cut off funds in mid-season" as it would be "disastrous" to both the farm and the Bank. His "bewilderment" was expressed to IntraWest. None of the importunities of this or the previous witnesses resulted in any change in IntraWest's position. I accept this testimony.

Tom Ammerman, the County Supervisor for the Farmer's Home Administration, was called as a witness by the Bank. Mr. Ammerman expressed that he had relied upon Mr. Salvi at IntraWest when Salvi stated that the Bank would fund Fairview Farms and such funds would be available. Based upon this representation, Ammerman co-signed checks for Fairview Farms. It was only when checks were returned for insufficient funds that Salvi advised Ammerman, in response to Ammerman's telephone communication, that there would be no more funding. This witness also expressed the concern that a Bank should not cut off funds in mid-season, especially without contacting the borrower. I accept this testimony.

Finally, Gordon Kennedy, the Investment Manager over Real Estate Operations for Prudential Insurance Company, testified with respect to cessation of funding. He expressed his concern that it was after Prudential declined to purchase the property that the Bank quit funding its loan. He attempted to contact Adams, but was only afforded approximately a four to five minute meeting. No explanation was forthcoming. In thirty three years of farming, Mr. Kennedy indicated he never saw a loan terminated in mid-season. I also accept this testimony.

Based upon the evidence presented in this matter, it is clear no plausible or believable, rational reason has ever been forthcoming to explain the Bank's unilateral decision not to continue the loan and to abandon it's participation. This conduct resulted in the destruction of Fairview Farms, forcing it and Elmer Werth into bankruptcy.

## III.  CONCLUSIONS OF LAW

### A.  *Defenses of Res Judicata and Collateral Estoppel*

IntraWest contends that Werth is barred by the doctrines of res judicata and collat-

eral estoppel from objecting to the Bank's claim because he had an opportunity to object in the Chapter 7 bankruptcy proceeding of Fairview Farms, Inc. In fact, there was an adversary proceeding (81 MC 451—now closed) wherein the farm was sold free and clear of liens. Among the numerous defendants were the Bank, the Prudential Insurance Company, the United States acting for the FmHA and Werth. The Farm, IntraWest and the United States entered into a Stipulation there wherein the Farm admitted it owed IntraWest $800,000, secured by the real property and improvements thereon in the amount of $300,000. An order approving the Stipulation was entered on·December 7, 1981.

■ The doctrines of res judicata and collateral estoppel apply in the bankruptcy context. *Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966); *Matter of Exten*, 24 B.R. 888 (D.C.Md.1982). The definitions and applications of res judicata and collateral estoppel have recently been reiterated in a group of United States Supreme Court cases: *Federated Department Stores v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981); *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979); *Montana v. U.S.*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

In *Montana, supra,* the United States Supreme Court defined the doctrines thusly:

> A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a 'right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies ...' Under res judicata, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action. ... Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation. ... Application of both doctrines is central to the ·purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions.

Further, the Court in *Brown, supra* cautioned that a very careful inquiry should be made when applying these doctrines to foreclose an action.

■ Clearly, the doctrine of collateral estoppel does not apply because the issue of Werth's liability as a personal guarantor pursuant to a secured, continuing, personal guarantee, and defenses thereto, were simply never litigated in any court.

The determination of the application of res judicata is more intricate because the doctrine prohibits litigation of grounds for, or defenses to, recovery previously available to a litigant regardless of whether such matters were asserted or determined in the prior proceeding; *Brown, supra*. The important consideration is whether this matter could have been raised before.

■ I conclude Werth is not barred by res judicata in asserting his defenses to Claim No. 39. This conclusion requires explanation.

First, Werth had no standing to object to the claim of the Bank in the Fairview Farms bankruptcy proceeding. In that Chapter 7 proceeding it was the duty of the Trustee to object to the claim of the Bank. Collier, *Bankruptcy*, Sec. 502–01, p. 502.11 (15th Rev.Ed.1979). Further, since that bankruptcy proceeding is still pending the Trustee may still object to claims. 11 U.S.C. Sec. 502(j), Collier, *Bankruptcy*, (15th Rev.Ed.1979) Sec. 502.1, p. 502–18.

■ Also, the adversary proceeding was resolved by way of a stipulation entered into by the Farm, IntraWest, and the United States. A *stipulated* judgment is a bar only as to matters actually litigated, not as to matter which could have been litigated. *Tyson v. New York City Housing Authori-*

*ty,* 369 F.Supp. 513 (D.C.N.Y.1974); *Moore v. Deal,* 240 F.Supp. 1004 (D.C.Pa.1965).

■ Further, and most importantly, the issues in 81 Mc 451 and this proceeding are different. Therefore, the matters do not contain the same cause of action. Causes of action are identical for purposes of res judicata if the same evidence would be relied upon in the two proceedings. *City of Westminster v. Church,* 167 Colo. 1, 445 P.2d 52 (1968). In the Complaint to Sell Free and Clear of Liens adversary proceeding, the issues were what entities held valid mortgages on the real property, in what amount and was the proposed sale price sufficient to satisfy non-consenting lienors. *See 11 U.S.C. Sec. 363(f).* The issues here are whether the actions of the Bank gave rise to various defenses, assertible by a guarantor, to enforcement of the personal guarantee.

Thus, it is my determination that Werth is not barred by collateral estoppel or res judicata.

### B. *Defense of Lack of Standing*

■ IntraWest argues that Werth lacks standing to object to it's claim. The Bank contends that a guarantor cannot recover damages for breach of contract by the obligee, that only parties for whom a contract is made have a right of action based in contract and that a guarantor remains liable even where the lender-obligee refuses to advance further amounts to the obligor.

As to the general availability of defenses to guarantors, 38 C.J.S. *Guaranty,* Sec. 88 at 1259–1260 (1943), provides:

It may be stated generally that, in order that any matter may constitute a good defense to an action on a guaranty, it must be germane to the cause of action pleaded and present a legal reason why the guarantee should not recover.

In general, the guarantor may set up any defense that would have been available to the principal obligor, against the guarantee.

A number of federal courts have permitted guarantors to set up defenses of obligors.

*U.S. v. Willis,* 593 F.2d 247 (6th Cir.1979); *U.S. v. Terrey,* 554 F.2d 685 (5th Cir.1977); *Mercantile Financial Corp. v. Miller,* 292 F.Supp. 797 (D.C.Pa.1968).

Here, Werth is not pursuing an action for damages based upon breach of contract. Rather the debtor is in a defensive position in an objection to claim proceeding. A proof of claim is *prima facie* evidence of its validity. *In re John J. Orr & Sons,* 22 B.R. 874 (Bkrtcy.R.I.1982); 11 U.S.C. Sec. 502(a). However, where the evidence raises factual questions the creditor bears the ultimate burden of proving its claim. *John J. Orr & Sons, supra.* The same result was reached under the Bankruptcy Act. *In the Matter of King Resources, Inc.,* 20 B.R. 191 (D.C.Colo.1982). Thus, Werth is not attempting to recover damages; rather, he is defending against the Bank's enforcement of it's claim. Werth also has a direct interest in asserting these defenses, since if the Bank had not acted as it did, Werth may not have been called upon to respond on his guarantee.

The cases offered by the Bank to support its proposition that a guarantor remains liable, even where the lender refuses to advance further sums to the principal obligee are distinguishable. The Bank cites *Grill v. Driad Construction Corp., et al,* 34 N.Y.S.2d 593 (Sup.1942) for the principle that a guarantor cannot use defenses of the primary obligor. In fact, *Grill, supra,* merely holds that a guarantor, in New York, cannot use the defense of *fraud* upon the principle to escape liability.

Professor Simpson on *Suretyship,* Sec. 60, p. 291 (1942), states, "The termination of the principal's obligation by a failure of consideration discharges the surety." Simpson also points out, at pages 278–279, that there exists a split of authority on the issue of the availability to the guarantor of a defense of fraud on the principal debtor. The majority view is opposite that of the New York rule. In any event, the availability of a fraud defense is not relevant here, since no fraud defense is involved. No New York cases were cited or discover-

ed which extended this principle to other possible defenses.

A line of Georgia authorities is also cited by the Bank. The decision in *Hornsby v. First National Bank of Atlanta*, 154 Ga. App. 155, 267 S.E.2d 780 (1980), is cited for the proposition that a guarantor remains liable when the lender refuses to advance further amounts to the primary debtor. A reading of that decision indicates two loans were contemplated, with the guarantors obligated on both loans. Due to various circumstances, including foreclosure of the primary obligor, the Bank brought an action against the guarantors on their guarantee of certain lease payments. The guarantors defended on the basis that the Bank had committed to enter into other commitments which, if they had been funded, could have saved the foreclosure. The Supreme Court of Georgia held such a defense would not bar the lender from recovery of the amount owed under its first loan. Further, there were valid reasons for termination of the second loan commitment.

In the case of *Federal Deposit Insurance Corp. v. Lattimore*, 656 F.2d 139 (5th Cir.1981), the Fifth Circuit applied Georgia law, explaining as follows:

> As a general proposition under Georgia law, an action for fraud cannot be predicated on statements which are promissory in their nature as to future acts. ...
> Under this state of the Georgia law, the obligors may not assert a breach of promise to extend future credit. *Federal Deposit Insurance Corp. v. Lattimore, supra,* at page 145.

*Lattimore* noted that the breach of an agreement to make a loan will not support an action for fraud under Georgia law even if the purported lendor had no intention of making such advances at the time the promise was made. This, of course, is contrary to Colorado law that an action for fraud may be based on misrepresentation of a present intent to do a future act. *Teare v. Sussman*, 120 Colo. 488, 210 P.2d 446 (1949); *Stalos v. Booras*, 34 Colo.App. 252, 528 P.2d 254 (1974).

In short, neither the New York nor the Georgia lines of authority are persuasive under the facts or the law in this action.

In my view, under the facts of this case the rights of Fairview Farms based on breach of contract and failure of consideration are available to Werth in defense of the Bank's claim against him on his guarantee.

### C. *Fiduciary Relationship*

Werth contends that a fiduciary relationship was created between the Bank, Fairview Farms and himself from the long-standing lender-borrower-guarantor relationship. He produced evidence through which he attempted to show that the Bank invited and induced his trust and confidence.

■ Ordinarily, a bank does not act in a fiduciary capacity towards its customers or depositors absent special circumstances. *Dolton v. Capitol Federal Savings & Loan Association*, 642 P.2d 21 (Colo.App. 1981); *Klein v. First Edina National Bank*, 293 Minn. 418, 196 N.W.2d 619 (1972). In *Dolton, supra,* the Colorado Court of Appeals stated:

> While there is no per se fiduciary relationship between a borrower and lender, a fiduciary duty may arise from a business or confidential relationship which impels or induces one party to relax the care and vigilance it would and should have ordinarily exercised in dealing with a stranger. (citations omitted). In *Dolton, supra,* at p. 23.

IntraWest has argued at great length, both orally and in briefs, that no fiduciary relationship was created as a result of any trust and confidence reposed in the Bank. Indeed, the Bank has persuasively contended that its advertising and the image it endeavors to portray to the public is *not* intended to solicit trust and confidence of the public.

■ While the Bank's position is somewhat bizarre and extraordinary, I do not find facts here that indicate special circumstances were extant to reflect that IntraW-

est induced the Farm or Werth to relax their usual care and vigilance.

The Tenth Circuit in *Rader v. Boyd*, 252 F.2d 585 (10th Cir.1957), at page 587 held:

> While fiducial or confidential relationships recognized and enforced in equity do not rest upon any particular legal relationship, they do necessarily spring from an attitude of trust and confidence and are *based on some form of agreement, either express or implied, from which it can be said that the minds have met to create a mutual obligation.* (emphasis added).

After a close examination of the surrounding facts and history of this tripartite relationship, I conclude that Werth did not meet the burden imposed on the party who is asserting the existence of a fiduciary relationship. There was no express or implied agreement from which it can be said that the minds of the parties met to form such a unique legal relationship. The Bank always dealt with Werth and the Farm at arm's length and its unwillingness to finance the Farm in 1977 and 1980 is a clear indication of this attitude.

The Bank's primary objective of getting paid is not to be condemned. It must be noted that the Bank owed duties not merely to it's borrowers, but also to it's depositors and to it's stockholders.

### D. *Breach of Oral Agreement*

▆ Actions for breach of oral agreement to loan money have been recognized in Colorado. See *Leach v. Fuller*, 65 Colo. 68, 173 P. 427 (1918).

▆ Here, I have already found the parties agreed in approximately May, 1980 that the IntraWest Bank would provide Fairview Farms with a loan in the form of overdraft protection in the amount of $675,000 at 3% over prime, secured by previously described security and guarantees. Adams admits the Bank agreed to fund this amount and that the written documents were being prepared to evidence this agreement. All necessary elements of a contract were present. There was agreement between the parties. Consideration was present in the form of mutual promises. The contract was definite in its terms. The Farm complied with the Bank's request for a budget and a plan of liquidation and acted in accordance with all terms of the agreement.

There was a valid and enforceable contract between the parties.

Werth's defense of breach of contract is not precluded by the Statute of Frauds. Although contracts to lend money must ordinarily be in writing, *North Denver Bank v. Bell*, 528 P.2d 413, (Colo.App.1974) (not selected for official publication) part performance of a contract will remove the case from the statute. *Ridgeway v. Pope*, 163 Colo. 160, 430 P.2d 77 (1967); *Burnford v. Blanning*, 33 Colo.App. 444, 525 P.2d 494 (1974). The Bank's part performance of its obligation through partial funding pursuant to the oral agreement was clearly sufficient evidence to create an enforceable contract. Additionally, the Farm's action in reliance on the Bank's agreement also operates to remove the matter from the Statute of Frauds.

However, the absence of a writing bears critically on the existence of conditions in the contract.

▆ The intent to create a condition must appear expressly or by clear implication. *St. Germain v. Boshouwers*, 646 P.2d 952 (Colo.App.1982); *Charles Ilfeld Co. v. Taylor*, 156 Colo. 204, 397 P.2d 748 (1964). Of course, if a condition precedent is found, the failure to satisfy it excuses the first party from performing the contract. *North Denver Bank, supra.*

The only conditions established by the evidence were the security interests previously discussed and the personal guarantee of Elmer Werth, secured by further security interests, including the assignment of his second deed of trust on the Garrison Property.

All of these conditions were met. Werth did assign his interest in a second deed of trust on the Garrison Property to IntraWest. The second mortgage assigned by

Werth was not in default. The note executed with the second mortgage provided that no principal payments were to be made until condominium sales on the property were consummated. Interest payments on the principal amount of $570,000 were to be made in quarterly installments, beginning on February 21, 1980.

Jackie Chipman, an accountant retained by the debtor-in-possession, indicated that a payment was made on the second mortgage on June 6, 1980 in the amount of $597,592.77. The sum of $570,000 was allocated to principal and $27,592.77 to interest. Approximately $30,000 was actually due on interest at that time. Had the debtor directed application of payments first to interest, which he had a right to do (*Jackson v. ABZ Lumber*, 155 Colo. 33, 392 P.2d 288 (1964)), there would be no default. Payment on the principal was then actually early.

The evidence showed that the first mortgage was in default and eventually was the subject of foreclosure. However, keeping the first mortgage current was not a condition of the loan. When the Bank accepted the second mortgage it also assumed the risks inherent in a junior position. At the time the funding was terminated, the first mortgage was in default by approximately 10% of the total obligation owed. Notice of election and demand was not filed until ten weeks after termination of funding. The Bank admittedly had no "insecure clause" in the oral contract which might be utilized in justification of its action.

The deposition testimony of Ed Salvi, a former bank officer who was in charge of the Fairview Farms loan in the years 1975 through 1978, established that Werth was always totally honest in his dealings with IntraWest. Because the stability of the first mortgage was not a condition to the contract, Werth had no duty to inform the Bank of its particular circumstances. He had no right, of course, to deliberately conceal vital information in agreeing to provide the Bank with the assignment of his interest in exchange for the loan to Fairview Farms. But he did not conceal information. Difficulties with the first deed of trust were not even known to him at that time.

Further, the evidence demonstrated that the Bank was in constant contact with the owners of the Garrison Property, and it also relied on those owners for information. When Werth learned of the foreclosure, he promptly relayed the information to IntraWest.

Insofar as condominium sales were concerned, Werth thought sales were going well. He was led to believe that 34 condominium units were sold. There was no intentional concealment or misrepresentation on the part of Elmer Werth. The information which the Bank contends was concealed was equally available to the Bank. See *Ackmann v. Merchants Mortgage and Trust Corp.*, 645 P.2d 7 (Colo. 1982).

All essential elements of the condition relating to assignment of Werth's second deed of trust on the Garrison Property were met, and there was no misrepresentation by Werth which would excuse performance by the Bank.

The conditions precedent to the agreement herein were met by Werth and Fairview Farms. The Bank breached this agreement, without legal basis, by failing to honor its commitment on or about June 23, 1980.

#### E. *Promissory Estoppel*

██ The defense of promissory estoppel is equitable in nature and is designed to "create binding agreements in the interest of fairness to one detrimentally relying on the promise of another." *Shoemaker v. Mountain States Telephone and Telegraph*, 38 Colo.App. 321, 324, 559 P.2d 721 (1976). "The remedy is not co-extensive with that for breach of contract." *Bixler v. First National Bank of Oregon*, 49 Or.App. 195, 619 P.2d 895, 898, n. 4 (1980).

██ Inasmuch as I conclude that Werth's breach of contract defense is well founded, it is unnecessary to delve into the

defense of promissory estoppel. Suffice it to say that if a defense of breach of contract is established, *a fortiori*, the defense of promissory estoppel is made.

### F. *Damages*

■ Pursuant to 11 U.S.C. Sec. 502(b)(1) the claim of IntraWest shall be allowed except to the extent that it would be unenforceable against the debtor under any applicable law. In this objection to claim proceeding, the damages sustained by Werth are relevant to the extent that they offset the amount claimed by the Bank. Claim No. 39, filed herein by IntraWest, requests $525,634.39 plus accrued interest. Thus, the claim will be disallowed to the extent Werth establishes damages under Colorado law, resulting from the Bank's breach. However, in light of *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), I will not enter judgment for damages. Such damages will only be considered as a defense to the claim filed by IntraWest.

■ In general, the measure of damages for breach of contract is the loss in value to the injured party which flowed from the breaching party's failure to perform plus any other incidental or consequential loss, less any loss the injured party has avoided by not having to perform. *General Insurance Co. v. City of Colorado Springs*, 638 P.2d 752, 759 (Colo.1981). That is, the court should place the injured party in the position in which he would have been had the contract not been breached. *Carriage Bags, Ltd. v. Aerolinas Argentinas*, 521 F.Supp. 1363, 1367 (D.C.Colo.1981).

More specifically:

Damages for breach of contract to lend money are measured by the cost of obtaining the use of money during the agreed period of credit, less interest at the rate provided in the contract, plus compensation for other unavoidable harm that the defendant had reason to ·foresee when the contract was made.

*BA Mortgage Co., Inc. v. Unisal Development, Inc.*, 469 F.Supp. 1258, 1268 (D.C. Colo.1979), quoting *Restatement of Contracts*, 1st, Sec. 343 (1932).

Werth must prove facts which provide a reasonable basis for calculation of damages if he is to prove actual or consequential damages in an amount sufficient to disallow the Bank's claim. *Colorado National Bank v. Ashcraft*, 83 Colo. 136, 263 P. 23 (1928); *Cope v. Vermeer Sales and Service Corp.*, 650 P.2d 1307 (Colo.App.1982). Werth may prove consequential damages in the form of lost profits if those lost profits were reasonably foreseeable and are capable of calculation. *Prutch v. Ford Motor Company*, 618 P.2d 657 (Colo.1980).

The overwhelming impact of the testimony indicated the Bank's breach was the cause of the corporate bankruptcy of Fairview Farms and the personal bankruptcy of Elmer Werth. This testimony came primarily from Werth, Terry McGovern and Earl Wright, President of Asset Management Group, who was hired to assist in the financial affairs of Fairview Farms and Werth. Further, documents from the Bank's file in the form of memoranda from Ralph Adams acknowledged and predicted that a bankruptcy could conceivably occur if a 1980 crop loan wasn't in place. The Bank also had knowledge of the state of the potato market at all relevant times and should reasonably have foreseen the disastrous loss of profits which would be sustained by Fairview Farms if the loan to which the Bank had committed itself were not funded.

The Bank endeavored to show that the Farm was going to lose money in 1980 in any event and that, thus, the bankruptcy of Fairview Farms and Werth were not caused by any conduct on the part of the Bank. However, Mr. Wright stated that a break-even or deficit year in 1980 did not forecast bankruptcy for the Farm or Werth. It was his professional testimony that a reasonably successful year in 1980 would have enabled the Farm to pay off its debts over a period of time. It is evident to me from the weight of the testimony that

the abrupt cessation of funding by the IntraWest Bank resulted in the bankruptcy of Fairview Farms and Elmer Werth, and that each entity sustained damages thereby.

Both the Farm and Werth suffered extensive foreseeable and unavoidable harm as a result of the Bank's breach of contract to provide funding for the 1980 crop year. In its Chapter 7 bankruptcy, the Farm was sold free and clear of liens. The Bank's Proof of Claim filed in that action represents in part a measure of damages sustained by Werth. The 1980 crop year would have enabled the Farm and Werth to retire a substantial portion of the Farm's debt. Additionally, First National Leasing Company and Equitable Leasing Company filed claims for deficiencies on farm equipment leases, which were personally guaranteed by Werth. Werth also claims that his personal liability to the FmHA in the amount of $315,000 was a result of the Bank's failure to fund. I agree the evidence establishes this to be a fact.

The value of lost equity in the Farm was between $400,000 and $500,000, of which Elmer Werth's share was 50% as a 50% stockholder. A significant item of damage resulting from the breach was a requirement that Werth enter into a crop-sharing agreement with Acie Gunnels, wherein Gunnels recouped 75% to 80% of crop profits in exchange for his financing and operating the Farm. Gunnels stated that he realized a profit of $400,000 when, at best, he had expected a $60,000 gain. It cannot be assumed the Farm would have enjoyed such profits in the absence of Gunnels' management. However, it is evident from the past performance of the Farm that it would have enjoyed similar profits. It is also to be observed that Gunnels had already been hired as the Farm Manager before the Crop Management Agreement. There is nothing in the evidence to indicate Gunnels would have performed with any less degree of professionalism had he not achieved the Property Management Agreement.

I also conclude the claim of IntraWest in its Claim No. 39 in the amount of $525,000 would not have occurred but for its own conduct. Thus, this is an item of damage to Elmer Werth.

The damages sustained by Elmer Werth as a result of the conduct of IntraWest Bank of Denver far exceed the claim of IntraWest in the amount of $525,630 plus accrued interest. Therefore, the Claim will be disallowed in its entirety. An Order disallowing this Claim will be entered contemporaneously with these Findings of Fact and Conclusions of Law.