**In re Frank GIORGIO, Pauline Giorgio, Debtors.**

**John BOYAJIAN, Trustee, Plaintiff,**

**v.**

**Alan J. DEFUSCO and Anita Defusco, individually and in their capacities as coexecutors of the estate of Pasco DeFusco, Defendants.**

**Bankruptcy No. 8300260.**
**Adv. No. 840016.**

United States Bankruptcy Court,
Rhode Island.

July 2, 1986.

Andrew S. Richardson, Boyajian, Coleman & Harrington, Providence, R.I., for trustee, plaintiff.

Herbert F. DeSimone, Bruce A. Leach, Law Offices of Herbert F. DeSimone, Providence, R.I., for defendants.

## ·DECISION

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

Notwithstanding our attempt to be brief, the travel of this case to date, spanning a period of 17 years, and the novelty and complexity of issues of law and fact raised, have resulted in the following (but necessarily) lengthy decision.

From approximately 1953 until 1978, Frank and Pauline Giorgio owned and operated a bar and restaurant in West Warwick, Rhode Island, known as the Club 400. On April 7, 1983, the Giorgios filed a joint Chapter 13 petition. On July 19, 1983, a proof of claim was filed on behalf of the estate of Pasco DeFusco in the amount of $41,445, based on a consent judgment entered into between the Giorgios and DeFusco in November 1977. The instant adversary proceeding, commenced on January 26, 1984, was heard on June 20, July 2, and July 3, 1985, on the trustee's amended complaint, in the following five counts, all of which are strenuously opposed by the defendants:

1. Count I seeks recovery of $15,429 paid by the Giorgios pursuant to a promissory note dated September 8, 1975, on the ground that the loan was usurious under R.I.GEN.LAWS § 6–26–2 and § 6–26–4 (1969) (current versions in 1985 Reenactment).

2. Count II seeks recovery of $19,000 paid by the Giorgios between 1973 and 1975, also on an allegedly usurious loan in violation of R.I.GEN.LAWS § 6–26–2 and § 6–26–4 (1969) (current versions in 1985 Reenactment).

3. Count III is a claim under the Rhode Island Racketeer Influenced and Corrupt Organizations Act (state RICO Act), R.I. GEN.LAWS §§ 7–15–1 to 7–15–11 (1985 Reenactment), seeking treble damages ($150,000).[1]

4. Count IV is a claim under the federal Racketeer Influenced and Corrupt Organizations Act (federal RICO Act), 18 U.S.C. §§ 1961 to 1968 (1984 & 1986 Supp.), which parallels the state RICO claim.

5. Count V is a request for equitable subordination of a claim in the amount of $41,455, filed in this case on behalf of the estate of Pasco DeFusco, who died on May 17, 1981.

The defendants raise numerous defenses, and also assert a counterclaim in the amount of $41,445, based upon their proof of claim # 9, filed on July 19, 1983. At the conclusion of the hearing on June 20, 1985, the trustee's claims against Anita DeFusco (the widow of Pasco DeFusco), individually, were dismissed for lack of proof.[2] Also, believing that he cannot collect damages under both the state and federal RICO statutes, the trustee abandoned his claim under Count IV (federal RICO Act). Trustee's Supplemental Memorandum of Law at 14.

## FACTS

Based upon the testimony, much of which was in sharp and irreconcilable conflict, we make the following findings and conclusions:[3] In 1969, Frank Giorgio, an

---

1. The trustee does not specify how he arrived at the $150,000 figure. *See supra,* at 26 for our computation of RICO damages.

2. A decision which, in hindsight, may not have been sound, but cannot be cured at this late stage of the proceeding.

3. This decision constitutes the findings of fact and conclusions of law required by Bankruptcy Rule 7052 and Fed.R.Civ.P. 52. Defendants'

previous request to the District Court for withdrawal of reference of this matter was denied by District Judge Bruce M. Selya. *Boyajian v. DeFusco (In re Giorgio),* 50 B.R. 327 (Bankr.D.R. I.1985). On February 7, 1985, we denied defendants' motion for abstention, and in construing the then recently enacted 28 U.S.C. § 157(b), we held that this matter was a core proceeding. In the interest of judicial economy, should certain counts of the trustee's amended complaint

admitted compulsive gambler, began borrowing money from Pasco DeFusco to pay betting losses. Since the beginning of his business relationship with Giorgio, DeFusco accepted no principal payments, but always applied all payments to interest, at the rate of 10% per week. There were no promissory notes executed, no records kept (or produced), and no receipts for payment for any of these transactions, which were always in cash. By 1973, Frank Giorgio's gambling habit had become so serious, and his losses so extensive, that he could no longer make the required weekly interest payments. According to Giorgio, by 1973 he had paid at least $50,000 to DeFusco, on advances of no more than $20,000, with no reduction in principal.[4]

In 1973, when Pauline Giorgio finally became aware of the real extent of her husband's gambling and borrowing activities, she confronted DeFusco, one on one, and he confirmed that all payments made by Giorgio had been applied to interest only, and that the principal balance was still $19,000. Mrs. Giorgio accepted DeFusco's version of the history and status of the loan, and offered to pay DeFusco $200 per week, until the $19,000 was paid, provided that no additional interest would be charged. Pursuant to this arrangement, to which DeFusco agreed, between 1973 and 1975 a weekly $200 cash payment was either delivered to Pasco DeFusco by Mrs. Giorgio's son, Frank Giorgio III, or was picked up at the Club 400 by DeFusco's son, Alan. Frank Giorgio III (son) and the Giorgios' daughter, Diane Vitalo, both of whom worked at the Club 400 during this period, confirmed that Alan DeFusco came to the restaurant, pretty regularly, on Monday mornings to collect $200.

This was all denied by Alan DeFusco, who testified that he never collected any payments from the Giorgios for his father. Although he stressed that he knew very

little about his father's business practices, Alan also asserted (inconsistently) that he was certain that his father was not in the habit of lending money without a written agreement. He also testified that during the relevant period, he and his father had little contact with the Giorgios, that his father played poker at the Club 400 only occasionally (3 or 4 times a year), and that he (Alan) had never played cards at the restaurant. This testimony is in direct conflict with the Giorgios' version (which we accept as true) that both Pasco and Alan DeFusco played cards at the Club 400 on a regular basis. A former employee of the Giorgios, Anthony Parente, also testified that both DeFuscos were frequent patrons at the Club 400. It is the finding of this Court that Alan DeFusco did not testify truthfully concerning his collection activities and/or his involvement in his father's business affairs. As to these and all other relevant items in dispute, the testimony of Alan DeFusco is rejected.

In September 1975, after Mrs. Giorgio had paid the entire $19,000 under the arrangement described above, Frank Giorgio was still in serious financial difficulty, and he again approached Pasco DeFusco to borrow money. DeFusco agreed to loan $25,000 to the Giorgios, but this time, instead of the usual verbal arrangement, he required them to sign a note in the amount of $44,000 (but he did not disclose this until the day of the closing). It is undisputed that the Giorgios received only $25,000 at the closing. According to Pauline Giorgio, when she protested that she was being charged again for the $19,000 she had previously paid, DeFusco shrugged, and said that the additional $19,000 was included because he had not received interest while Mrs. Giorgio was paying off the $19,000. TR. June 20, 1985 at 91. The Giorgios testified that they signed the note, despite their total surprise at its terms, because they were about to lose their business un-

---

be determined, on appeal, to be related (non-core) matters, those portions of this decision affected thereby should be considered as *proposed* findings of fact and conclusions of law. *See* 28 U.S.C. § 157(c)(1).

**4.** The evidence indicates that Giorgio paid DeFusco as much as $60,000 by 1973, but for purposes of this decision we have used the lower figure of $50,000.

less they made some immediate payments on their debts, and had no other means of quickly obtaining the desperately needed funds.

A vastly different recital of the facts was testified to by attorney William J. Riccitelli, the drafter of the note in question and the attorney who counseled Pasco DeFusco regarding this transaction. Riccitelli stated that the closing was "amicable, a happy, a joyous occasion." TR. July 3, 1985 at 20. Based on the criteria normally used to judge credibility, we find Mr. Riccitelli's testimony to be implausible, and his version of the events in question is rejected. Of particular concern, and a point on which Mr. Riccitelli was examined by the Court at length, is that the $44,000 note made no reference that only $25,000 was to be advanced and that $19,000 was allegedly for past consideration:

Q. The question of this $19,000, did you give any thought to—there is nothing mentioned in the note about the fact that $25,000 was to be paid and the other 19 was for past consideration, is there?

A. No, not in that note.

Q. Is it there in any note?

A. No, there is no other note.

Q. Do you have any notes at all dealing with this $19,000. That's a lot of what this case is about?

A. Well, I have my files, Your Honor.

Q. Did you give any thought to making it explicit in the terms of the note—what was really being done?

. . . .

Q. Do you remember the question, and the reason I'm asking the question and I'll explain it so you will know. You said that you read the entire note to these people to be sure that they understood, and then asked if they understood it and then you assured yourself that they understood it. But was there any discussion about $25,000 and $19,000 at this closing?

A. Yes, there was. When I told him that the note was for $44,000 and that was clearly typed in the upper left-hand corner and I read the note to them so I

said that *this loan is for the $19,000 that you owe Mr. DeFusco from the past loan, which had never been reduced to writing* and additionally he has agreed to lend you $25,000 so when you add the 19 and the 25 you get $44,000. This was why it says $44,000. You're only going to receive today $25,000 and I asked them if that was clear and did they understand it and in my presence they said, yes, they understand, because I said if there's any doubt, don't sign the loan—take that—the note, and that was what I explained to them.

Q. Was there any reason, when you were drafting the note, why that wasn't spelled out in the note?

A. That's the way I—in my legal expertise decided to handle this transaction.

. . . .

Q. I've heard your answer about your experience and expertise as why you drafted the note the way you did, but in going into detail like this, about place of payment, [and other terms and conditions], I'm going to ask you again why you determined not to spell out the details of how much of this loan was cash and how much was for past loans?

. . . .

A. Well, I decided to write the note in a manner in which it would be legally binding, so the note would be legal and in the interest of simplicity I decided to write it in this fashion, that the parties could clearly see that the amount that was due and owing was $44,000. . . .

TR. July 3, 1985 at 15–19 (emphasis added).

In addition to being evasive and unconvincing, Riccitelli's testimony conflicts with Answers to Interrogatories signed under oath by his client, Pasco DeFusco (notarized, and probably prepared, by Riccitelli) which stated that $19,000 was given to the Giorgios *the day before the note was signed.* See Plaintiff's Exhibit D, Interrogatories filed in connection with litigation in Kent County Superior Court, C.A. No. 77–27. When Riccitelli testified as to the $19,000 prior loan, he clearly was not referring to an extension of credit on the day before the note was signed. We reject the testi-

mony of both Pasco DeFusco (in his sworn answers to interrogatories), and his attorney, and find that neither version is correct or true. When carefully weighed, the evidence is clear that the 1975 promissory note contained a masked interest charge of $19,000, in addition to the 15 percent per annum interest rate referred to in the note.

The Giorgios made 44 payments on the note and then defaulted. In January 1977, DeFusco instituted a collection suit in the Kent County Superior Court. Testifying at the Bankruptcy Court hearing, John Gazzero, Esq., who represented the Giorgios in the Superior Court action, recalled that they had been apprehensive about appearing in Court, that they refused to testify on the day of the trial, and insisted that he "get the best deal you can." On November 25, 1977, the Giorgios signed a consent judgment in favor of DeFusco, in the amount of $38,500.

Thereafter, with new counsel, the Giorgios moved to vacate the consent judgment under Superior Court Rule of Civil Procedure 60(b), alleging duress and coercion. After hearing, the motion was denied by Mr. Justice McKiernan, and on appeal, the Rhode Island Supreme Court upheld the validity of the consent judgment, concluding

> it is reasonable to infer that the trial justice gave great weight to the testimony of the one witness [Gazzero, Jr.] uninvolved in the litigation who stated that the motivation for the Giorgios' decision to consent to judgment was their desire to avoid the adverse publicity they believed would accompany such litigation. For these reasons, we think the Giorgios should be bound by their decision to release any potential defense of usury.

*DeFusco v. Giorgio,* — R.I. —, 440 A.2d 727, 732 (1982).

## DISCUSSION

### I. USURY

Counts I and II of the trustee's amended complaint are based on the state usury statute in force when the agreements were made in 1973 and 1975, R.I.GEN.LAWS § 6–26–2 (1969) (current version in 1985 Reenactment), which provides:

> **6–26–2. Maximum rate of interest.—** [N]o person, partnership, association, or corporation loaning money to or negotiating the loan of money for another ... shall, directly or indirectly, reserve, charge or take interest on such loan, whether before or after maturity, at such a rate, or reserve, charge to take compensation for services or expenses incidental to the making, negotiation or collection of such loan, in such an amount that the aggregate of interest and all other amounts for services or expenses charged to the borrower shall exceed twenty-one percent (21%) per annum of the unpaid principal balance of the net proceeds of such loan, not compounded, nor taken in advance, nor added on to the amount of the loan. . . .

■ In Count I, plaintiff alleges that the September 8, 1975 promissory note is usurious because DeFusco advanced only $25,-000, rather than $44,000 referred to in the note, resulting in an illegal interest charge of $19,000 (plus the 15% per annum referred to in the note). The note calls for 156 weekly payments of $350.66 which, on a $25,000 loan, yields an interest rate well in excess of the permitted 21%,[5] in clear violation of R.I.GEN.LAWS § 6–26–2.

Once a violation of § 6–26–2 is established, the borrower is entitled to relief under R.I.GEN.LAWS § 6–26–4 (1969) (current version in 1985 Reenactment), which provides:

> **Usurious contracts void—Recovery of payments by borrower.—**Every contract hereafter made in violation of any of the provisions of § 6–26–2, and every mortgage, pledge, deposit, or assignment made or given as security for the performance of such contract, shall be usuri-

---

5. The 1981 amendments to R.I.GEN.LAWS § 6–26–2 (1981 R.I.Pub.Laws Ch. 173, § 2), which are inapplicable to the instant proceeding, provide that the maximum allowable interest rate fluctuates, based upon the interest rate paid on U.S. treasury bills.

ous and void ... and if the borrower shall, either before or after suit, make any payment on such contract, either of principal or interest, or of any part of either ... said borrower shall be entitled to recover from the lender the amount so paid, in an action of the case.

Under the applicable Rhode Island statutes, therefore, the trustee, as successor to the Giorgios' claim, is entitled to recover $15,429 under Count I, which represents all payments made by the Giorgios on the 1975 note. *Household Finance Corp. v. Swartz (In re Swartz)*, 37 B.R. 776, 779 (Bankr.D. R.I.1984).

■ Count II of the trustee's complaint deals with the agreement between Pasco DeFusco and Pauline Giorgio in 1973, wherein she agreed to pay DeFusco $19,000, in weekly installments of $200. The consideration for those payments was a prior debt owed to DeFusco by Frank Giorgio based upon a series of loans between 1969 and 1973, which called for payment of interest at the rate of 10% per week. Frank Giorgio, whose testimony on this point is accepted, borrowed, at most, $20,000 from DeFusco between 1969 and 1973, and paid DeFusco at least $50,000 (all applied to interest) during that period.[6] The agreement between Mrs. Giorgio and DeFusco, based on the prior loans wherein the 10% weekly rate of interest grossly exceeded the 21% maximum annual rate allowed by statute, also violates R.I.GEN.LAWS § 6-26-2.

Based upon the credible evidence, we conclude that between 1973 and 1975 Pauline Giorgio paid DeFusco $19,000, which the trustee is entitled to recover, pursuant to R.I.GEN.LAWS § 6-26-4 (1969) (current version in 1985 Reenactment).

#### The Usury Defenses

The defendants argue that the trustee's usury claim is barred by (1) the statute of limitations applicable to civil actions; (2) the doctrines of res judicata and collateral estoppel, and (3) the statute of limitations applicable to claims filed against a decedent's estate in a probate proceeding. For the following reasons, we conclude that these defenses all lack merit.

#### (1) Statute of Limitations/Civil Actions

■ The defendants argue that the trustee's usury claim is barred by R.I. GEN.LAWS § 9-1-13 (1969) (current version in 1985 Reenactment), which requires a civil action to be brought within six years[7] from the date *the cause of action accrued. See Swiss v. Eli Lilly & Co.*, 559 F.Supp. 621 (D.R.I.1982). It is defendants' contention that the date of the last payment to DeFusco, November 21, 1976, is the latest date on which a cause of action accrued, and that the statute of limitations barred a usury action after November 20, 1982. While the Bankruptcy Code permits the trustee a two-year period within which to commence actions, it does so only for claims which have not been otherwise barred prior to the filing of the bankruptcy petition. *See* 11 U.S.C. § 108; *Musso v. Tesmetges (In re Tesmetges)*, 47 B.R. 385, 391 (Bankr.E.D.N.Y.1984). The defendants maintain that as of April 7, 1983, when the Giorgios filed their bankruptcy petition, the statute had run, barring any action for usury by either the Giorgios or their successor in interest, the trustee. For the following reasons, we disagree.

Virtually any acknowledgment of an existing debt tolls the running of the statute of limitations. *Ash v. Isaacson*, 59 R.I. 407, 419, 195 A. 700 (1937); *La France v. Moquin*, 49 R.I. 151, 141 A. 307 (1928). Each promise of payment constitutes a separate agreement, and with each successive promise, the right of action is renewed. *Rodriques v. Santos*, —— R.I. ——, 466 A.2d

---

**6.** Whether the trustee is entitled to recover $50,000 in interest paid to DeFusco between 1969 and 1973 is an issue not raised, and on which we express no opinion.

**7.** R.I.GEN.LAWS § 9-1-13 was amended by 1978 R.I.Pub.Laws Ch. 299 to extend the statute of limitations from six years to ten years. However, because the amended statute applies only to causes of action accruing *after* July 1, 1978 (the loan transactions here in dispute all occurred prior to that date) it is not applicable to this matter.

306, 310 (1983). In *Rodriques,* a creditor who had advanced $30,000 between 1948 and 1949 did not file suit to recover the monies until 1964. The trial court concluded that the statute of limitations defense was without merit, since there had been a series of acknowledgments of the debt, and this holding was affirmed by the Rhode Island Supreme Court. *Id.* at 310. Similarly, "where a series of usurious transactions are involved, it [has been] held that the statute of limitations does not begin to run against the right to recover [usurious payments] until they are closed." 45 Am. Jur.2d *Interest and Usury* § 280 (1969).

In the matter before us, a cause of action accrued as recently as November 25, 1977, when the consent judgment was entered. Recovery under R.I.GEN.LAWS § 6–26–4 applies to "[e]very *contract* hereafter made in violation of any of the provisions of § 6–26–2 ..." (emphasis added). In *Trahan v. Trahan,* — R.I. —, 455 A.2d 1307 (1983), the Rhode Island Supreme Court held that a consent judgment "is in essence a contract between the parties" and "[s]uch a judgment is to be construed as a contract using the rules of construction applicable thereto." *Id.* at 1310. When the Giorgios executed the promissory note in September 1975, and received $19,000 less than the face amount of the note, this constituted an assertion by De-Fusco of the existence of a prior indebtedness, as well as a reluctant acknowledgment by the Giorgios. Likewise, when the parties entered into the consent judgment in 1977, that agreement constituted an acknowledgment of all prior indebtedness. For the same reasons set forth in the *Rodriques* case, any bar to claims which existed prior to 1977 was removed by entry of the consent judgment, and the statute of limitations began to run again on November 25, 1977.

The date of the consent judgment (which acknowledged and reaffirmed both the usurious 1975 promissory note, and the $19,000 agreement between Mrs. Giorgio and De-Fusco, also based on a usurious loan) represents the latest date on which a cause of action for usury accrued, and controls the commencement of the running of the statute of limitations. *See Trahan v. Trahan, supra. See also United States v. Northern Colorado Water Conservancy District,* 608 F.2d 422 (10th Cir.1979) (consent decree is to be construed as a contract). The debtors' petition was filed on April 7, 1983, within six years of the date of the consent judgment. The trustee's complaint, filed on January 26, 1984, came within the two year extension afforded him pursuant to 11 U.S.C. § 108.

(2) Res Judicata and Collateral Estoppel

The defendants also contend that res judicata and collateral estoppel should bar Counts I and II of the trustee's complaint, in view of the decision of the Rhode Island Supreme Court in *DeFusco v. Giorgio, supra.*

Without question, the doctrines of res judicata and collateral estoppel apply in the bankruptcy context. *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979); *Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966); *Heiser v. Woodruff,* 327 U.S. 726, 66 S.Ct. 853, 90 L.Ed. 970 (1946); *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). The United States Supreme Court has recently examined their application, *see Federated Department Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981); *Brown v. Felsen, supra; Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), and has held that their purpose is to bar vexatious litigation and to foster the conclusive resolution of disputes. As the Supreme Court ruled in *Montana, supra,* the principle embodied in res judicata and collateral estoppel is that a "right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies ..." *Id.* 99 S.Ct. at 973 (quoting *Southern Pacific R. Co. v. United*

*States*, 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897)).

█ We view this litigation as anything but vexatious, and stress that the issues before us have not been heard or determined on the merits. The doctrine of collateral estoppel does not apply here precisely because the issue of usury has never been litigated or decided, either by the Rhode Island Supreme Court in *DeFusco v. Giorgio, supra,* or in any other proceeding. Solely at issue in that case was whether the Giorgios had established grounds to vacate a consent judgment, under Superior Court Rule of Civil Procedure 60(b). In holding that "[a] judgment entered by consent cannot 'be opened, changed, or set aside without the assent of the parties in the absence of fraud, [duress] mutual mistake or actual absence of consent' " (citation omitted), the court in *DeFusco v. Giorgio* did not consider the usurious nature of the loan. Since that question has not been litigated, and because the issue of usury is now, for the first time, squarely before any court, collateral estoppel is not a bar. *See Dunlop v. Rhode Island,* 398 F.Supp. 1269 (D.R.I.1975) (collateral estoppel bars relitigation of questions of fact *actually litigated* and decided). *See also* Restatement (Second) of Judgments § 27, comment e (1982): "[I]n the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated"; *Frank v. Daley (In re Daley),* 776 F.2d 834, 838 (9th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986) ("[s]ince the dismissal with prejudice was entered pursuant to a stipulation, the fraud claim was not actually litigated").

The doctrine of res judicata ensures finality of decisions, but as was cautioned in *Brown v. Felsen:* "For the sake of repose, res judicata shields the fraud and the cheat as well as the honest person. It therefore is to be invoked only after careful inquiry." 442 U.S. at 132, 99 S.Ct. at 2209. We obviously subscribe fully to that principle here, and enlist to the fullest the protection it affords against "the fraud and the cheat" in this case. *See In re Werth,* 37

B.R. 979 (Bankr.D.Colo.1984), *aff'd,* 54 B.R. 619 (Bankr.D.Colo.1985); *Weeks v. Kinslow (In re Weeks),* 10 B.C.D. 492, 28 B.R. 958 (Bankr.W.D.Okla.1983); *Societa Internazionale Turismo v. Barr (In re Lockwood),* 11 B.R. 291 (Bankr.E.D.N.Y.1981). *See also Jeter v. Hewitt,* 63 U.S. (22 How.) 352, 364, 16 L.Ed. 345 (1859) ("res judicata renders white that which is black, and straight that which is crooked"). This Court is not inclined to condone or permit such results on the facts before us.

█ Federal courts should accord state court judgments res judicata effect to the same extent that the state itself would give its prior judgments such effect. *See Gonsalves v. Alpine Country Club,* 563 F.Supp. 1283 (D.R.I.1983), *aff'd,* 727 F.2d 27 (1st Cir.1984); *In re Moultrie,* 51 B.R. 368 (Bankr.W.D.Wash.1985). Rhode Island has adopted what has been described as a conventional approach to questions of this type: "For a court decision to be given res judicata effect in Rhode Island, there must be: (i) identity of parties; (ii) identity of issues; and (iii) finality of judgment." *Gonsalves v. Alpine Country Club, supra,* at 1287. In determining the res judicata effect on the instant usury action, we examined carefully whether the trustee's cause of action is identical to that of the Giorgios.

█ In *In re Kreiss,* 46 B.R. 164 (Bankr. E.D.N.Y.1985), the court held that the trustee was not barred by res judicata from challenging the validity of will codicils, notwithstanding a previous determination of their validity by a New York state court, because it was determined that the *trustee's* interest, i.e., the interest of creditors, was not represented at the state court hearing. "[A] person cannot be barred from litigating a claim unless he was a formal party or 'in privy' with a formal party to the first action ... [T]he trustee, who was neither a formal party ... nor represented by a party ... [is not barred] from litigating this claim." *Id.* at 166, 167. In bringing the instant action, the trustee is carrying out his duties to "collect and reduce to money the property of the es-

tate," and to "object to the allowance of any claim that is improper," 11 U.S.C. § 704, and his interest in pursuing this litigation is distinct from the motives of the Giorgios when they capitulated in the Superior Court action. A primary obligation of the trustee is to ensure that the assets are liquidated and distributed equitably among creditors, and to accomplish this, fraudulent and/or usurious claims must be subject to scrutiny. 11 U.S.C. § 502(b)(1). Because there is no similarity or unity of interest between the trustee and the debtors, the doctrine of res judicata is not a bar to the trustee's present action. In *LM Ericsson Telecommunications, Inc. v. Teltronics Services, Inc. (In re Teltronics Services, Inc.)*, 18 B.R. 705 (Bankr.E.D.N.Y.1982), the court stated:

> Operation of res judicata requires identity of parties. Yet the creditors presently represented by the trustee were not parties to the original action, nor were their interests represented therein. Thus, they cannot be bound by the dismissal of the action.

*Id.* at 706.

The United States Supreme Court decision in *Heiser v. Woodruff, supra,* relied on by defendants, does not support their position. In that case, it was the trustee who had fully, but unsuccessfully, litigated in another forum the issue of the validity of a default judgment. The court held in *Heiser* that "where the trustee in bankruptcy unsuccessfully litigates an issue outside the bankruptcy court the decision against him is binding in the bankruptcy court." 66 S.Ct. at 856. We respect and agree with that holding, but it plainly does not apply here. In contrast to the facts in *Heiser,* the interests of the trustee and the estate were not represented when the Giorgios, for reasons personal to themselves, *chose to consent to judgment and not to litigate the claim of usury.* The trustee correctly observes that, "whatever the Giorgios' motives were in choosing not to litigate the usury claim, they were certainly not the motives of the trustee." Trustee's Supplemental Memorandum of Law at 8. Accordingly, we hold that res judicata is not a bar to the present action, since the dispositive issues have not been previously litigated in another forum by the trustee (or anyone else, for that matter). *Heiser v. Woodruff, supra,* 66 S.Ct. at 860.

In addition, we seriously question the right of the Giorgios to waive any claim of value, for no consideration and for reasons personal to themselves, at a time when they were insolvent and indebted to creditors who were the inevitable parties in interest in any waiver.[8]

Until now there has been no judicial inquiry into the dealings between the Giorgios and the DeFuscos. With such convincing evidence before us of serious wrongdoing by Pasco and Alan DeFusco, and to prevent further harm to innocent creditors whose claims total almost $150,000, it is appropriate to restrict the preclusive affect of the Rhode Island Supreme Court decision in *DeFusco v. Giorgio, supra,* to its narrowest possible construction, consistent with the doctrine of full faith and credit. *See In re Kreiss, supra,* at 166 ("[p]ursuant to 28 U.S.C. § 1738 a federal court must give a state court judgment the same res judicata effect as the judgment would receive under the law of the state which rendered it"). The Rhode Island Supreme Court's affirmation of the trial court's refusal to vacate the consent judgment clearly did not address the merits of the Giorgios' usury claim:

> Thus, for purposes of the trial court's determination of whether grounds exist under Rule 60(b)(3) and (b)(6) to set aside the judgment, any defenses that the Giorgios may have had against DeFusco's recovery on the note [e.g., usury] *were irrelevant* (emphasis added).

*DeFusco v. Giorgio, supra,* at 729.

The very fact that the Giorgios, for reasons personal to themselves, chose to waive

---

**8.** Indeed, if the trustee were a party to any of the prior proceedings: 1) he would not have agreed to the things stipulated to by the Giorgios, and 2) even if he were inclined to so stipulate, bankruptcy court approval of such a move would have been very difficult to come by. *See In re Hydronic Enterprise, Inc.,* 51 B.R. 176 (Bankr.D.R.I.1985).

and/or abandon what we have found, after a lengthy and fully contested trial, to be a meritorious claim, is further support for the proposition that the doctrine of res judicata should not be strictly applied here. In fact, if required to do so, we would be constrained to hold that the Giorgios were totally without authority to abandon or waive the claims in question, while insolvent, to the obvious and inevitable detriment of their creditors.

For the foregoing reasons, the doctrines of res judicata and collateral estoppel neither bar Counts I and II of the trustee's complaint, nor prevent this Court from inquiring into the claim asserted by the defendants, to determine whether it is founded upon a proper debt, or on an illegal loan. *See Brown v. Felsen, supra.*

(3) Statute of Limitations/Probate Claim

 A third defense raised—that the time allowed for filing claims against the decedent's estate has expired—may be dismissed with little comment. The relevant statutory provision on which defendants rely is R.I.GEN.LAWS § 33–11–5 (1984 Reenactment):

> **33–11–5. Time allowed for filing claims—Petition to allow late filing—Appeal.**—Claims shall be filed within six (6) months from the first publication. Claims not filed within six (6) months from the publication shall be barred; *Provided, That a creditor who, by reason of accident, mistake or any other cause, has failed to file his claim, may, at any time, before the distribution of the estate, petition the probate court for leave to file his claim, and the probate court, after notice to the executor or administrator of the estate and a hearing on the petition, may in its discretion, grant leave to file such claim* upon such terms, if any, as the court shall prescribe, which claim, if allowed, shall be paid out of the assets remaining in the hands of the executor or administrator ... (emphasis added).

There is nothing in this statute which precludes the trustee from filing a claim in the probate court at a later date. In fact, the statute establishes a specific procedure by which a creditor may, in the discretion of the probate court, file a claim out of time. Defendants' arguments under § 33–11–5 are rejected.

## II. STATE RICO

Count III of the trustee's complaint seeks damages under the Rhode Island Racketeer Influenced and Corrupt Organization Act, R.I.GEN.LAWS §§ 7–15–1 to 7–15–11 (1985 Reenactment), alleging that defendants' activities fall within the prohibited conduct in § 7–15–2(c), which states:

> It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate in the conduct of the affairs of the enterprise through racketeering activity or collection of an unlawful debt.

R.I.GEN.LAWS § 7–15–1 defines many of the terms used in § 7–15–2(c):

> 7–15–1. Definitions.—
>
> . . . .
>
> (b) "Person" includes any individual or entity capable of holding a legal or beneficial interest in property.
>
> (c) "Enterprise" includes any sole proprietorship, partnership, corporation, association, or other legal entity, and any union or group of individuals associated for a particular purpose although not a legal entity.
>
> (d) "Unlawful debt" means a debt incurred or contracted in an illegal gambling activity or business or which is unenforceable under state law in whole or in part as to principal or interest because of the law relating to usury.

In order to prevail on the state RICO claim, the trustee must establish that the defendants are associated with an "enterprise," and that their activities involve the collection of an "unlawful debt." We emphasize that we are not concerned here with alleged criminal RICO violations, and that the trustee's burden of proof with respect to all RICO-related issues raised here is the same as in any civil action. *See United States v. Cappetto,* 502 F.2d 1351,

1357 (7th Cir.1974) ("standard of proof is lower in a civil proceeding than it is in a criminal [RICO] proceeding").

The defendants maintain that in their proof of claim (and counterclaim) they are simply attempting to collect on a valid state court judgment, in their capacities as coexecutors of the estate of Pasco DeFusco, that they are not associated with any enterprise, and that they are not attempting to collect an unlawful debt. Defendants also raise the defenses of collateral estoppel and res judicata,[9] which we reject for the same reasons previously discussed vis-a-vis the trustee's usury counts.

■■■ Although we are unaware of any Rhode Island case law dealing with the recently enacted state RICO Act in the civil context, the definitions provided in R.I. GEN. LAWS § 7–15–1 parallel those in the federal RICO Act, 18 U.S.C. § 1961, which have come under judicial review. In applying the federal RICO Act, courts have held that a decedent's estate constitutes an "enterprise," within the statutory definition of that term. *See, e.g., Gunther v. Dinger,* 547 F.Supp. 25 (S.D.N.Y.1982). The court in *Gunther* concluded that the definition of an enterprise, including any "legal entity" or "group of individuals," is purposely broad. *Id.* at 27. Similarly, we see no reason why the definition of the term "enterprise" in the state RICO Act should not include a decedent's estate. We also find that Alan and Pasco DeFusco were acting as an "enterprise," within the meaning of § 7–15–1 (a group of individuals associated for a particular purpose), in connection with their collection of $19,000 between 1973 and 1975.

■■■ For the reasons discussed above, we find that the debt which the defendants are attempting to collect in this Court is indeed unlawful. *See Sedima, S.P.R.L. v. Imrex Co., Inc.,* — U.S. —, 105 S.Ct.

3275, 87 L.Ed.2d 346 (1985) (the scope of federal RICO Act violations is broad); *American Nat'l Bank and Trust Co. of Chicago v. Haroco, Inc.,* — U.S. —, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985) (charging of excessive interest rate constitutes federal RICO offense). But the defendants also assert that even if it is determined that their claim is based on a usurious promissory note, the note was merged into the consent judgment, so that their activity in this Court is merely an effort to collect on that judgment, and not an attempt to collect an illegal debt. The case on which defendants rely in support of this merger argument, *Ballard v. First Nat'l Bank of Birmingham,* 259 F.2d 681 (5th Cir.1958), holds that when the issue of usury is fully litigated and judgment entered after a *complete* judicial determination, then the underlying contract is merged with the judgment, so that the usurious loan is "purged." The "merger doctrine" discussed in *Ballard* is inapplicable here, however, since the judgment in favor of DeFusco was *not* entered pursuant to a full trial on the issue of usury, and we conclude that the usurious loans in question were not purged by, or merged with, the consent judgment. The defendants' argument that the consent judgment launders the otherwise illegal nature of this loan, is far removed from the real world of racketeering and loansharking, and would, if accepted here, strip the protection intended to be provided by RICO.

■■■ Alan DeFusco's collection activities between 1973 and 1975, and his continuing attempt to collect an illegal debt in this Court constitute RICO violations.[10] We have heard extensive and convincing testimony regarding the loansharking of both Pasco and Alan DeFusco, who were privy to and knowingly participated in these illegal activities. Because of Alan's

---

9. The argument of res judicata is inapplicable here because the 1977 consent judgment was entered two years before the enactment of the state RICO Act (1979). A cause of action grounded on RICO allegations could not have been previously litigated, much less decided.

10. Although Alan DeFusco's collection activities began back in 1973, he is presently continuing to attempt to collect the same illegal debt in this Court, so that the statute of limitations does not bar the trustee's RICO claim.

active involvement, he is estopped from contending now that he is only attempting to collect a lawful debt. We conclude, therefore, that as to the coexecutors of the estate of Pasco DeFusco, and as to Alan DeFusco individually,[11] the trustee has established a civil RICO violation under R.I. GEN.LAWS § 7–15–2, and that he is entitled to recover damages in accordance with R.I.GEN.LAWS § 7–15–4(c):

> Any person injured in his business or property by reason of a violation of this chapter may sue therefor in any appropriate court and shall recover treble damages and the cost of the suit, including reasonable attorneys' fees.

Accordingly, the trustee should recover $103,287 (3 × $15,429 paid on the note, plus 3 × $19,000 paid between 1973 and 1975, pursuant to Mrs. Giorgios' agreement with DeFusco), plus interest, costs, and reasonable attorneys' fees.

## III. EQUITABLE SUBORDINATION

Since the claim of the estate of Pasco DeFusco is based on an agreement which is unenforceable under Rhode Island usury law, it is disallowed, pursuant to 11 U.S.C. § 502(b)(1).[12] *See Wilmington Trust Co. v. Behr (In re Behr)*, 42 B.R. 922 (Bankr.E. D.Pa.1984) (stipulated judgment between debtors and creditor does not prevent trustee from challenging validity of a claim in bankruptcy proceeding); *See also Wolfe v. Ebert*, 37 B.R. 934 (Bankr.D.S.C.1983) (bankruptcy court has inherent authority and responsibility to assure that claims are free from usury, regardless of whether debtors are estopped from asserting usury as a defense). However, even if the claim were allowed here (or, if on appeal it is determined that all of our foregoing analyses are incorrect, and our holdings reversed), the facts in this proceeding demand equitable subordination of the claim

in question. *See* 11 U.S.C. § 510. *See also Pepper v. Litton, supra* (bankruptcy court may sift the circumstances surrounding any claim to see that injustice or unfairness is not done in the administration of the estate).

■ As a court of equity, the bankruptcy court has the inherent power to "prevent the consummation of a course of conduct by a claimant which would be fraudulent or otherwise inequitable, by subordinating his claim to the ethically superior claims asserted by other creditors." *Matter of Mobile Steel Co.*, 563 F.2d 692, 699 (5th Cir.1977), *quoted in Limerick v. Limerick (In re Answerfone, Inc.)*, 48 B.R. 24, 27 (Bankr.E.D.Ark.1985).

Three conditions must exist before a claim is properly subordinated:

(1) The claimant must have engaged in some type of inequitable conduct.

(2) The misconduct must have resulted in injury to creditors or conferred an unfair advantage on the claimant.

(3) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.

*See Wilson v. Huffman (In re Missionary Baptist Foundation of America)*, 712 F.2d 206 (5th Cir.1983); *Trone v. Smith (In re Westgate-California Corp.)*, 642 F.2d 1174 (9th Cir.1981); *Machinery Rental, Inc. v. Herpel (In re Multiponics, Inc.)*, 622 F.2d 709 (5th Cir.1980); *Katz v. Department of Justice (In re Bellucci)*, 29 B.R. 814 (B.A.P. 1st Cir.1983); *In re Wilnor Drilling, Inc.*, 29 B.R. 727 (Bankr.S.D.Ill.1982); *Reiner v. Washington Plate Glass Co. (In re Washington Plate Glass Co.)*, 27 B.R. 550 (Bankr.D.D.C.1982); 3 *Collier on Bankruptcy* ¶ 510.05, at 510–8 to 19 (15th ed. 1985).

---

11. We recognize that the "enterprise" itself may not be found liable for civil damages, and have not so held here. *See Shofield v. First Commodity Corp. of Boston*, 793 F.2d 28, 33 (1st Cir. 1986).

12. § 502. Allowance of claims or interests

(b) [T]he court, after notice and a hearing, shall ... allow such claim ... in such amount, except to the extent that—
(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured....

While equitable subordination is most commonly applied in situations involving insiders, subordination of claims is also authorized in proper non-insider cases. *See, e.g., Anaconda-Ericsson, Inc. v. Hessen (In re Teltronics Services, Inc.),* 29 B.R. 139 (Bankr.E.D.N.Y.1983); *Fruehauf Corp. v. T.E. Mercer Trucking Co. (In re T.E. Mercer Trucking Co.),* 16 B.R. 176 (Bankr.N.D.Tex.1981); *Bergquist v. First National Bank of St. Paul (In re American Lumber Co.),* 5 B.R. 470 (Bankr.D. Minn.1980). The degree of misconduct required to subordinate the claim of a non-insider has been described as "very substantial ... involving moral turpitude." *See Bank of New Richmond v. Production Credit Assoc. of River Falls (In re Osborne),* 42 B.R. 988, 996 (Bankr.W.D.Wis. 1984).

Defendants' claim is based upon loansharking activities which Pasco DeFusco and his counsel attempted to disguise as a lawful promissory note. Although the maximum credit extended was $44,000, the Giorgios paid DeFusco at least $84,000 [13] between 1969 and 1976. It is clear that Pasco DeFusco was fully aware of the Giorgios' critical ongoing financial difficulties, making him not unlike the drug dealer, whose customers are locked into doing business and who will continue to be regular users as long as their addiction lasts. We find that the extraction of such exorbitant interest charges constitutes a level of moral turpitude sufficient to satisfy the standard required for equitable subordination. Because of the unconscionable terms imposed by DeFusco over such a long time, he controlled the Giorgios' finances in a way which caused other creditors to suffer financially, while DeFusco profited from his inequitable (and probably criminal) conduct. *See In re Osborne, supra.* Considering all this, it would be difficult to imagine a result more ludicrous than if the DeFusco claim were to be placed on a level equal to that of creditors whose claims are not tainted. Accordingly, even if the defendants' proof of claim is determined to be allowable on appeal, we hold that subordination of said claim to the claims of all other general creditors is appropriate, and it is so ordered.

## CONCLUSION

For the above-stated reasons, judgment should enter against the coexecutors of the estate of Pasco DeFusco on Counts I, II, III, and V, and against Alan J. DeFusco, individually, on Count III. Under R.I. GEN.LAWS § 6–26–4, the co-executors are liable, jointly and severally, to the trustee for all amounts paid on the 1975 promissory note ($15,429), and for all payments made between 1973 and 1975 pursuant to Mrs. Giorgio's agreement with DeFusco ($19,000). The trustee's request for interest and costs under Counts I and II is also allowed. In addition, the trustee may recover against Alan DeFusco, in his individual capacity, and against the coexecutors, jointly and severally, under the state RICO Act, R.I.GEN.LAWS § 7–15–4(c), treble damages in the amount of $103,287 (three times $15,429 paid on the note, plus three times $19,000 paid pursuant to Mrs. Giorgios' agreement with DeFusco), plus interest, costs, and reasonable attorneys' fees, to be determined after application and hearing. The defendants' claim is disallowed, or alternatively, is subordinated to the claims of general creditors. Finally, the counterclaim which the defendants assert in their amended answer, is denied.

Enter Judgment accordingly.

---

13. The $84,000 figure is comprised of 1) $50,000 paid by Frank Giorgio to DeFusco between 1969 and 1973; 2) $19,000 paid by Pauline Giorgio to DeFusco between 1973 and 1975; and 3) $15,429 paid by the Giorgios pursuant to the 1975 note.